Filed 6/30/11

# IN THE SUPREME COURT OF CALIFORNIA

| | | |
|---|---|---|
| THE PEOPLE, | ) | |
| | ) | |
| Plaintiff and Respondent, | ) | |
| | ) | S047867 |
| v. | ) | |
| | ) | |
| LESTER WAYNE VIRGIL, | ) | |
| | ) | Los Angeles County |
| Defendant and Appellant. | ) | Super. Ct. No. YA016781 |
| _____ | ) | |

A jury convicted defendant Lester Wayne Virgil of murdering 22-year-old Soy Sung Lao during a doughnut shop robbery.[1]  The jury also convicted defendant of two other robberies, both committed with a knife and one accompanied by an assault with force likely to produce great bodily injury, and found true a robbery/murder special circumstance.[2]  Because the penalty was set at death, this appeal is automatic.  We affirm the judgment.

## BACKGROUND

I.    **Guilt Phase**

A.    *Robbery of Beatriz Addo*

On the morning of October 13, 1992, Beatriz Addo was working alone at the LaBargain Grocery, which she owned with her husband.  The store was

_____

[1]    Penal Code sections 211 and 187, subdivision (a).  All statutory references are to the Penal Code unless otherwise stated.

[2]    Sections 12022, subdivision (b), 245, subdivision (a)(1), and 190.2, subdivision (a)(17).

located in an alley near the intersection of Van Ness Avenue and West El Segundo Boulevard, in Gardena.  Sometime between 10:00 and 11:00 a.m., Addo was talking with a neighbor when defendant rode up on a bicycle.  He parked outside, walked in, and asked if either woman wanted to buy the bike.  When they declined, he asked about a brand of shaving cream.  Although Addo said they did not carry the brand, defendant searched the store's shelves for it.  He then asked if Addo could give him a job.  Addo promised to check with her husband, and defendant wrote down the name "Robert William," a telephone number, and the address "1202 Denker, Apt. #10."  He left, and the visiting neighbor left soon thereafter.

About five minutes later, Addo was alone.  Defendant returned and walked toward the display shelves.  Defendant then grabbed Addo from behind and pushed her toward the bathroom.  Addo felt something pricking her in the back.  Defendant ordered her to sit on the toilet, but instead she knelt to pray.  Defendant left, closing the door behind him.  Addo heard the ring of the cash register opening.  After about 10 minutes of silence, Addo emerged to find the telephone line had been cut and the cash register left open.  Approximately $60 had been taken, along with an envelope containing $600 in rent money, which had been stored underneath the register.  Addo had small cuts and scratches on her back but did not require medical attention.

Addo described the robber as a Black man of average weight, with short hair and two to three days' growth of beard.  He wore long dark pants and a black T-shirt.  In June 1993, Addo picked defendant's picture from a six-photo lineup, and in October 1993, she identified him in a live lineup.  She also identified him at both the preliminary hearing and trial.

B.    *Robbery and Murder of Soy Sung Lao*

Around 3:40 in the afternoon on October 24, 1992, Los Angeles County Park Police Sergeant Donald Tiller and his partner went to the Donut King for coffee.  The small, family-owned shop was located in a strip mall near the

LaBargain Grocery. While his partner waited in the patrol car, Tiller went inside and ordered from Soy Sung Lao, who was working behind the counter. Ms. Lao was the only employee in the shop, and defendant the only customer. Defendant sat at a table with a white styrofoam cup and an orange gym bag nearby. Sergeant Tiller observed defendant during the three minutes he spoke with Ms. Lao at the counter. It seemed unusual that defendant stared fixedly out the window and would not look in his direction. In the sergeant's experience, people usually looked at him when he was in uniform. Defendant was wearing a dark jacket, a dark "Malcolm X" cap, and dark jeans. He appeared to be about six feet tall, 165 to 170 pounds, with "kind of a straggly beard."

Lavette Gilmore worked at a hair salon in the same strip mall. Around 3:30 or 4:00 p.m. on October 24, 1992, she went to the doughnut shop and saw defendant sitting in the window with a small coffee cup and a bag. He wore a cap and a black shirt with red on it and drew Gilmore's attention because he looked "rugged." He was thin and unkempt, with long hair. He slouched and would not return Gilmore's gaze. Gilmore stayed in the shop talking for 20 or 25 minutes. She and Sergeant Tiller left at the same time. Gilmore expressed concern to Tiller that defendant looked "funny."

Debra Tomiyasu had an appointment at Gilmore's hair salon that afternoon. She left around 3:40 p.m. and walked into the Donut King. She noticed an orange duffel bag and a black Malcolm X cap on one of the customer tables but saw no one in the shop. Tomiyasu yelled out "hello" two or three times, to no response. A minute or two later, Deandre Harrison walked in. The two waited a few minutes more, calling for service. Harrison walked in and out of the shop's front door several times to trigger its buzzer. They then heard a series of muffled, high-pitched screams. As the screams grew louder, defendant emerged from the back of the store and walked straight to the cash register, which was partially open. He took the money inside, walked out the front door, and ran across the parking lot. A woman staggered out from the back of the store, covered in blood. Still

3

screaming, she held a blood-soaked white cloth to her neck. She took a few steps, then collapsed. No one else emerged from the back. No sounds indicated anyone else was in the store.

Tomiyasu followed defendant and chased him across the parking lot, screaming for help. Meanwhile, Harrison ran to another shop and called 911. After Tomiyasu lost sight of defendant, she also attempted to call the police, but they arrived before she had time to dial. Other than defendant and the bleeding woman, Tomiyasu and Harrison saw no one else in the shop, and no one else left after defendant fled.

Ella Ford was picking up dry cleaning at the strip mall when she heard a woman screaming from the Donut King. She dismissed the screams as the sound of children playing. Defendant ran out of the doughnut shop and almost knocked her down. She noticed he was holding something close to his body in his left hand. Ford turned away but looked back at defendant after someone yelled, "he stabbed her." She eventually lost sight of defendant as he ran down the street.

Felipe Santoyo was working at a fish market in the strip mall when he heard the commotion. A crying woman said, "she's bleeding." Santoyo ran to the doughnut shop, where several people had gathered. He saw Lao, whom he knew, lying on the floor, "bleeding a lot." He went to her and placed some bags under her head "so she didn't feel on the floor." Santoyo was soon joined by Lavette Gilmore and Trina Simmons, who had run to the shop from Gilmore's salon when they learned of the stabbing. Lao's eyes were open and she was asking for help. She managed to give her family's phone number before she lost consciousness. Santoyo left to call Lao's family.

Gardena Police Officers Blane Schmidt and Jody Schnabl were the first authorities to arrive at the scene. Paramedics arrived minutes later. They transported Lao to a hospital, but her condition deteriorated rapidly in the ambulance and she never regained consciousness.

4

After the paramedics left, Officer Schmidt interviewed Simmons, Harrison, and Tomiyasu.  Tomiyasu described defendant as having a round face, dark skin, a "scraggly" beard and mustache, a "wild-like appearance to his eyes," and dark smudges on his face.  His hair was very short, and he appeared to be in his late 20's or early 30's.  Defendant looked like a homeless or transient person because he was very thin, with a drawn face and wild-eyed look.  He wore blue jeans, dark shoes, and a black T-shirt with an outline of Africa on the front.  Harrison also remembered that defendant wore blue jeans and a black T-shirt with Africa depicted in red, yellow, and green.  He was tall and thin, with medium-brown, dirty skin and a "rough, ruggish" beard and mustache.  Ella Ford gave a similar description.  She said defendant was a little over six feet tall, 150 pounds, with a full beard, and wearing jeans, tennis shoes, and a black T-shirt with "African colors."  Twice that evening, the police asked Tomiyasu to view suspects they had detained, but she did not make a positive identification of either.

At the crime scene, police officers found the cash register drawer open but with no bills in the tray.  A blood trail extended from the restroom to where Lao had fallen.  Behind the closed door of the restroom, a large blood pool was oozing into the drain.  Blood was smeared on the inside doorknob and doorjamb.  A knotted towel and a pair of women's shoes lay on the floor.  Police officers never discovered a murder weapon.  At one of the tables in the dining area, someone had left an open gym bag, a baseball cap, a styrofoam cup, and a pair of shoelaces.  The gym bag contained several raffle tickets.  Defendant's latent palm print was lifted from the table.  Although other latent fingerprints were recovered, none could be matched to defendant.

Lao was stabbed 30 times with a single-edged blade approximately five-eighths of an inch wide and five to six inches long.  Her hands and arms showed multiple defensive wounds.  Two stab wounds pierced the rib cage and sliced completely through her liver, causing massive abdominal bleeding.  Another stab wound to the chest collapsed a lung.  Forensic evidence established that the

stabbing took place in the employee restroom. The bathroom door was closed after the attack, but Lao managed to open it. Bleeding from her many wounds, Lao moved toward the silent alarm button and collapsed nearby. The many undisturbed blood pools and droplets in the hallway showed that Lao's attacker left the bathroom before she did.

### C.  *Robbery and Assault of Samuel Draper*

Samuel "Joe" Draper was a mechanic at the Southwest Bowl. On October 31, 1992, defendant appeared in the doorway of the mechanic shop and asked Draper for a dollar for bus fare. Draper recognized defendant from the bowling alley, but they had never spoken before. Draper gave him a dollar from his shirt pocket. Defendant started to leave but then asked for another dollar. Draper walked into the shop to retrieve a dollar from his wallet. Defendant took the money and left. He returned about five minutes later carrying a plastic shopping bag, which he asked Draper to keep for him. When Draper turned to carry the bag inside, defendant grabbed him from behind and put a knife to his throat. Draper tried to grab the knife, cutting his fingers on the blade. Defendant said, "Get down and I won't hurt you." When Draper complied, defendant tied his hands and feet with an extension cord and belt and tied a dirty rag around Draper's mouth as a gag. Defendant plucked the wallet from Draper's pocket, took out $40 to $50 in cash, and left, dropping the empty wallet.

Minutes later, Draper managed to free himself. He went inside the bowling alley and reported the incident. Later, Draper spoke to two men who believed they had seen defendant living out of a van parked in a nearby alley. Draper reported this information to the police and showed them the van, but defendant was not in the area. Draper described defendant as six feet tall, of medium build, and with a mustache and goatee.

While investigating the Draper robbery, Detective Jacques LaBerge learned that the suspect may have been the same person recently arrested for stealing a pie from a church bake sale. Using that booking photograph of defendant, LaBerge

6

prepared a photographic lineup, which he showed to Draper. Draper identified defendant as the person who had robbed him.

**D.** *Investigation*

During the investigation of Lao's murder, Sergeant Hernandes Lobo determined that the raffle tickets found in the gym bag were originally sold to Joe Vaouli in late September or early October of 1992. Shortly afterward, they were stolen from Vaouli's car while he was visiting his friend Joe Draper at the Southwest Bowl. Vaouli had reported the theft to the raffle's organizer but not to the police.

In June 1993, the Gardena Police Department prepared and circulated a flier about the doughnut shop killing. Along with information about the date and location of the crime, the flier displayed photographs of the gym bag and other items found at the scene, a description of the suspect, and a composite sketch prepared with Tomiyasu's assistance. The flier was distributed to surrounding police agencies.

Detective Richard Cohen thought the suspect in the flier resembled defendant, whom he had recently arrested for burglarizing a church. In addition to noting this resemblance, Detective Cohen knew that defendant "had been hanging around the Southwest Bowl and possibly committing crimes there." Detectives Cohen and LaBerge met with Sergeant Lobo to share information about the possibly related crimes. Afterward, Sergeant Lobo prepared a new mug shot lineup containing the photograph of defendant that had previously been shown to Draper.

Tomiyasu and Harrison both identified defendant in the photo lineup. Beatriz Addo identified defendant as the person who had robbed her. Sergeant Tiller did not make an immediate identification when shown the photographs but asked if he could see pictures of the men in profile. Sergeant Lobo created a new group of profile photographs, and Tiller identified defendant. A live lineup was

7

conducted at the sheriff's department on October 19, 1993.[3] Tiller, Addo, Harrison and Draper all identified defendant. Tomiyasu could not decide between defendant and another man in the lineup. Although defendant looked like the robber, he had gained significant weight. Tomiyasu asked to see another photographic lineup. When one was prepared, she identified defendant as "definitely the man that I saw in the donut shop."

Lavette Gilmore said she could not distinguish between defendant and another man in Sergeant Lobo's first photographic lineup. When shown the profile photographs shown to Sergeant Tiller, Gilmore identified defendant. At the live lineup in October 1993, Gilmore identified a different suspect. She later confessed to the police, however, that she had purposefully picked the wrong person because her husband had warned her not to get involved. Gilmore later asked to see another photographic lineup. On January 20, 1995, shortly before trial, she viewed another six photos and was "over a hundred percent sure" defendant was the man she had seen at the doughnut shop.

Ella Ford avoided contact with the police for years because she was afraid of retaliation. She did not attend the live lineup and refused to speak with the police about the incident until shortly before defendant's trial. On January 6, 1995, Ford finally met with the police and identified defendant from a photographic lineup.

Defendant did not present any evidence in the guilt phase of trial, and the jury convicted him of all charges.

## II. Penalty Phase

### A. *Prosecution Evidence*

#### 1. *Victim Impact*

Soy Sung Lao was 22 years old when she was murdered. She was the youngest of six siblings in a close-knit family. After their parents died in 1975

---

**3**    Defendant was in custody at the time on an unrelated offense.

8

and 1976, the siblings took care of each other.  In 1980, when Lao was 10 years old, they fled from a communist regime in Cambodia.  Sleeping in the forest and hiding from soldiers, they escaped first to Thailand, then came to the United States.  The family settled in San Diego.

In 1987, Lao's sister Lynn Lao Ngov married and moved to Los Angeles to run the Gardena doughnut shop.  When she graduated high school, Lao moved nearby and enrolled in the University of Southern California.  Lao was a full-time college student majoring in international relations, scheduled to graduate in May 1993.  Lao was very close to Ngov's two children.

Ngov last saw Lao at the doughnut shop on the day of the murder.  She had left the shop around noon, while Lao worked on alone.  When someone phoned saying Lao had been stabbed, Ngov was shocked and drove straight to the doughnut shop.  She arrived just after the ambulance drove away.  Ngov still felt shocked and "numb" about the murder.  Two and a half years later, she still thought about her sister every day.

### 2. *Other Crimes*

On several occasions in October 1992, defendant rented a room at the Hilltop Motel, where Julio Montulfar and his wife Benita Rodriguez worked as nighttime caretakers.  The first time defendant checked in, he had about $300 cash.  He did not have enough money to pay for his room on other nights, however, and borrowed money from Montulfar.

Around 9:00 p.m. on October 29, 1992, five days after Lao's murder, defendant came into a room Benita Rodriguez was cleaning.  Defendant asked after Montulfar, and Rodriguez explained that he had gone to the store.  About 10 or 15 minutes later, Rodriguez began cleaning another room.  When she emerged from the bathroom, defendant was standing near the bed holding a knife.  The door to the room was closed.  Defendant put a finger to his lips, motioning Rodriguez to be quiet.  At knifepoint, defendant took Rodriguez's rings and watch, then asked for the office key.  Rodriguez, who spoke little English, repeatedly told defendant,

"No money." She knelt at defendant's feet, imploring him not to kill her. Defendant tried to tie Rodriguez's hands behind her back using a shoelace, but she refused to cooperate. He gestured for Rodriguez to remove her pants. When she did not understand, defendant "got on all fours on top of the bed" and told her to imitate the position. When Rodriguez refused, defendant repeatedly kicked her, stabbed her in the side, and tried to suffocate her. He stabbed her a total of 20 times in the face, arm, stomach, and leg. Fearing for her life, Rodriguez screamed and tried to grab the knife blade, which was about five or six inches long. She managed to take hold of the blade and break it off, seriously injuring her finger. Defendant fled. Trailing blood, Rodriguez staggered to the office and told Montulfar defendant had stabbed her.

Rodriguez underwent three surgeries to treat the injuries to her stomach and intestines. She suffered persistent digestive problems and could eat only once a day. The attack left her face disfigured. Her left eye drooped partially closed, impairing her vision. She had difficulty sleeping and was afraid to be alone.

In addition to the attack on Benita Rodriguez, the jury learned that defendant had been convicted of burglary in 1983, in California, and again in 1989, in Louisiana.

### B. *Defense Evidence*

Defendant's older sister, Debra Virgil, testified about his upbringing. Defendant and his sister were raised by a teenage mother in Los Angeles. Defendant's father moved back to Louisiana before defendant's birth. His mother waitressed and relied on welfare payments for support. The family moved often and lived in small apartments. They always had enough food and clothing, and their mother was always attentive to her children's educational needs. When defendant and his sister were very young, their mother was convicted of manslaughter. She was jailed for a brief period, during which the children stayed with their aunt. Their mother drank excessively and sometimes disciplined defendant harshly, using her hand, a belt, or an extension cord. The discipline

grew more severe as defendant got older; he became angry and resentful. Defendant's mother always had a reason for imposing discipline, but she never demonstrated affection.

Another child, Dexter, was born when defendant was almost 12 years old. Dexter's father was also involved in defendant's life. Loving and affectionate, he tried to teach the children positive values. Nevertheless, defendant's grades began dropping in junior high school, and he ran away from home briefly when he was 14 or 15. He started working part-time jobs and dropped out of high school at age 16 or 17. Defendant had few friends outside his extended family. In 1982, after he served a county jail sentence for stealing tools from a garage, defendant moved with his sister to Tallulah, Louisiana. Defendant worked at different jobs, eventually entered the job corps, and started a romantic relationship with Annie Antoine.

Antoine testified that she and defendant began living together in Shreveport, Louisiana, in 1987. Antoine noticed changes in defendant's behavior when he started spending time with his cousin Chester, a cocaine user. Defendant still worked but began staying out late at night. In 1989, he was arrested and imprisoned for burglarizing a warehouse. When paroled in May 1991, defendant moved in with Antoine and his sister Debra, who were living together in Los Angeles. During this time, Antoine continued to notice changes in defendant's personality, and their relationship deteriorated. After a few months, defendant moved to Las Vegas. When Antoine joined him two weeks later, she noticed that he had lost a significant amount of weight and displayed mood swings. Defendant stayed out all night, or for days at a time. When Antoine accused him of having an affair, defendant admitted he was abusing cocaine. Antoine eventually moved to live with a sister in Salt Lake City. She then discovered she was pregnant with defendant's child.

Antoine resumed contact with defendant when he was in jail. Defendant took pride in his son, Nigel, and arranged for his family to help with the boy's

care. Despite defendant's addiction to cocaine, Antoine believed he would be a good father. He had never been violent toward her. She was shocked to learn about the doughnut shop murder.

## DISCUSSION

### I. Guilt Phase Issues

#### A. *Defendant's Absence from Court Proceedings*

Defendant claims that the occurrence of several bench conferences during jury selection and trial deprived him of his statutory (§ 1043) and constitutional rights to be personally present during critical stages of the trial.[4] Defendant has not shown that his absence from these conferences " 'prejudiced his case or denied him a fair and impartial trial.' " (*People v. Bittaker* (1989) 48 Cal.3d 1046, 1080, quoting *People v. Jackson* (1980) 28 Cal.3d 264, 309-310.) We reject his claims as unduly speculative. (See *People v. Waidla* (2000) 22 Cal.4th 690, 742.)

During voir dire, the trial court conducted all cause challenges at sidebar. Defendant did not object to this procedure, although defense counsel expressed a preference that challenges be conducted in open court. He now complains of 12 instances in which prospective jurors were questioned at sidebar about sensitive

---

[4]     With regard to this claim and virtually every other claim raised on appeal, defendant asserts that the error violated his rights to a fair trial and reliable penalty determination under the Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution and corresponding provisions of the California Constitution. In most instances, defendant failed to make these constitutional arguments in the trial court. Nevertheless, unless otherwise indicated, we consider the merits of these newly raised arguments because either (1) the appellate claim is of a kind that required no objection to preserve it, or (2) the claim invokes no facts or legal standards different from those before the trial court, but merely asserts that an error had the additional legal consequence of violating the Constitution. (See *People v. Boyer* (2006) 38 Cal.4th 412, 441, fn. 17.) In those circumstances, defendant's new constitutional arguments are not forfeited on appeal. (*Ibid*.; see *People v. Partida* (2005) 37 Cal.4th 428, 433-439.) Where rejection of a claim of error on the merits necessarily leads to a rejection of the newly asserted constitutional objection, no separate constitutional analysis is required and we have provided none. (See *Boyer*, at p. 441, fn. 17.)

matters. Some of these sidebar hearings resulted in the prospective juror's dismissal for cause or the denial of a cause challenge. In four instances, sidebar questioning led to a prospective juror's excusal by stipulation. Defendant also complains of 16 occasions when trial proceedings were conducted outside his presence. Fourteen of these incidents were brief bench conferences held during the presentation of evidence or argument. Once, outside the presence of the jury, defendant was removed from the courtroom so that witnesses Montulfar and Rodriguez could be brought into court and ordered to return the following day. Defendant was also removed from court during part of a posttrial hearing when the court identified by name the jurors who had spoken at a previous hearing.

" 'A criminal defendant's right to be personally present at trial is guaranteed by the Sixth and Fourteenth Amendments of the federal Constitution . . . . [Citations.] A defendant, however, "does not have a right to be present at every hearing held in the course of a trial." [Citation.] A defendant's presence is required if it "bears a reasonable and substantial relation to his full opportunity to defend against the charges." [Citation.] The defendant must show that any violation of this right resulted in prejudice or violated the defendant's right to a fair and impartial trial. [Citation.]' (*People v. Hines* [(1997)] 15 Cal.4th [997,] 1038-1039.)" (*People v. Lucero* (2000) 23 Cal.4th 692, 716-717; see *Kentucky v. Stincer* (1987) 482 U.S. 730, 745; *United States v. Gagnon* (1985) 470 U.S. 522, 526.) The same analysis applies under article I, section 15 of the California Constitution. (*People v. Ochoa* (2001) 26 Cal.4th 398, 433; *People v. Waidla*, *supra*, 22 Cal.4th at p. 742.) "The standard under sections 977 and 1043 is similar. ' "[T]he accused is not entitled to be personally present during proceedings which bear no reasonable, substantial relation to his opportunity to

defend the charges against him . . . . [Citation.]" [Citation.]' [Citations.]"
(*People v. Rogers* (2006) 39 Cal.4th 826, 855.) [5]

"On appeal, we apply the independent or de novo standard of review to a trial court's exclusion of a criminal defendant from pretrial and trial proceedings, either in whole or in part, 'insofar as the trial court's decision entails a measurement of the facts against the law.' (*People v. Waidla*, *supra*, 22 Cal.4th 690, 741.)" (*People v. Cole* (2004) 33 Cal.4th 1158, 1230.) After independent review, we find no error. Defendant's constitutional right to be personally present was not violated.

Defendant has not indicated how his presence at any of the various sidebar conferences during voir dire or trial bore a reasonably substantial relation to his opportunity to defend himself. All of the bench conferences during trial concerned routine evidentiary or legal matters, and "we cannot conclude with respect to any one of them that [defendant's] personal presence either was necessary for an 'opportunity for effective cross-examination,' for purposes of the Sixth Amendment's confrontation clause [citation]; or would have 'contribute[d]' to the trial's 'fairness' in any marginal way, for purposes of the Fourteenth Amendment's due process clause [citation]; or bore a ' " ' "reasonably substantial relation to the fullness of his opportunity to defend," ' " ' for purposes of section 15 of article I of the California Constitution and also sections 977 and 1043 of the Penal Code [citation]." (*People v. Waidla*, *supra*, 22 Cal.4th at p. 742, italics omitted.) Defendant complains he should have been present at bench conferences when questions about his attorney's performance might have been raised, such as when the court sustained prosecutorial objections or overruled defense objections, when defense counsel agreed to limit his questioning to

---

[5]     We decline defendant's suggestion that we reexamine these established precedents based on what he finds to be the United States Supreme Court's increased reliance on common law in regard to an accused's right to be present at trial.

accommodate witnesses' schedules, and when defense counsel once asked to end the day early to attend to a personal matter.[6] Defendant also asserts that he should have been present when the prosecutor was criticized for failing to provide discovery on some witnesses.[7] In both cases, however, nothing suggests defendant's presence would have accomplished anything useful. Defendant does not claim that discovery violations by the prosecutor infringed his rights or entitle him to a new trial. Nor does he argue his attorney provided constitutionally ineffective representation. Defendant observed his attorney's performance in court, and he does not claim to have been unaware of defense strategies discussed at sidebar. Although counsel's sidebar arguments were not always successful, defendant has not identified any particular shortcoming that could have been grounds for a successful motion under *People v. Marsden* (1970) 2 Cal.3d 118.

Nor has defendant shown that his presence would have affected the outcome of the for-cause juror challenges argued at sidebar. (See *People v. Benavides* (2005) 35 Cal.4th 69, 89.) With few exceptions, defendant simply describes the proceedings and does not explain how his presence would have made a difference. In the examples he does discuss in detail, and which we consider below, we perceive no reasonable or substantial relation between defendant's absence from the proceedings and his ability to present a defense.

During sidebar conferences, two prospective jurors reported being abused as children. Defendant now contends his absence from these discussions was detrimental because he could have "provide[d] input to counsel regarding his assessment" of the effect of such abuse on the prospective jurors' views. Neither of these prospective jurors was excused immediately, however, and in both

---

**6** After the close of testimony in the penalty phase, defense counsel reported at sidebar that he had learned his mother-in-law had just died. Counsel asked if they could finish the proceedings early so that he could join his wife.

**7** Defense counsel complained the prosecution had not notified him that Montulfar would testify or provided notes of any interviews of this witness.

15

instances defendant and his attorney had an opportunity to discuss the information revealed at sidebar. In discussions of sensitive issues such as a prospective juror's childhood abuse, "allowing the defendant to be present 'could well undermine the confidence and cooperation' necessary" to encourage candor. (*People v. Ochoa*, *supra*, 26 Cal.4th at p. 435, quoting *People v. Hovey* (1988) 44 Cal.3d 543, 573.)

Defendant complains of another sidebar that was requested by one of the sworn jurors during the selection of alternates. This juror revealed at sidebar that he was familiar with the locations of the crimes and had talked with relatives about criminal activity in the area. After he returned to his seat, the lawyers remained at the bench and immediately agreed the juror had to be excused from service. In discussing how to fill the juror's seat, defense counsel requested that the court seat the first alternate juror but also give both sides an additional peremptory challenge. The court agreed. Defendant now complains that that this procedure was critically important and his absence deprived him of the "opportunity to provide . . . input to counsel." He raised no objection at the time, however, and even now fails to explain what useful "input" he could have given or what different procedure he might have urged. At most, defendant's absence from this tactical discussion deprived him of "a mere 'shadow' benefit" and does not amount to a constitutional or statutory violation. (*People v. Ochoa*, *supra*, 26 Cal.4th at p. 433; see *Snyder v. Massachusetts* (1934) 291 U.S. 97, 106-107 [accused has no constitutional right to be present "when presence would be useless, or the benefit but a shadow"].)

Finally, more than three years after briefing in this case had been completed, defendant filed a supplemental brief raising the new argument that the questioning of jurors at sidebar violated his federal constitutional right to a public trial. In *Presley v. Georgia* (2010) __ U.S. __ [130 S.Ct. 721], the high court held that a criminal defendant's Sixth Amendment right to a public trial extends to jury selection. (*Presley*, at p. 724.) However, the court recognized that "there are exceptions to this general rule. '[T]he right to an open trial may give way in

16

certain cases to other rights or interests, such as the defendant's right to a fair trial or the government's interest in inhibiting disclosure of sensitive information.' (*Waller*[ *v. Georgia* (1984)] 467 U.S.[ 39,] 45.)" (*Presley*, at p. 724.)

Initially, we note that the claim is forfeited because defendant failed to object on this ground below. "A defendant 'may, by his own acts or acquiescence, waive his right [to a public trial] and thereby preclude any subsequent challenge by him of an order excluding the public. Unlike the jury trial right which requires an express personal waiver [citation], the constitutional guarantee of a public trial may be waived by acquiescence of the defendant in an order of exclusion.' [Citations.]" (*People v. Edwards* (1991) 54 Cal.3d 787, 813.)

This late-raised argument claim also fails on the merits. Not every sidebar conference rises to the level of a constitutional violation. Trial courts retain broad power to control their courtrooms to maintain security, protect the defendant's interest in a fair trial, protect the privacy concerns of prospective jurors, and efficiently dispose of matters outside the hearing of jurors or testifying witnesses. (*Alvarado v. Superior Court* (2000) 23 Cal.4th 1121, 1150; *People v. Esquibel* (2008) 166 Cal.App.4th 539, 552.) We have also held that even a partial or temporary exclusion of the public from certain proceedings, if justified, imposes no more than a de minimus restriction on the constitutional right to a public trial. (*People v. Woodward* (1992) 4 Cal.4th 376, 385-386; see also *People v. Bui* (2010) 183 Cal.App.4th 675, 683-687 [concluding *Presley* did not alter the "de minimis" exception recognized in *Woodward*].)

Here, the courtroom was not closed. Defendant has directed us to no case that holds sidebar conferences to discuss sensitive or potentially prejudicial matters are akin to a closure of the courtroom, violating state or federal constitutional public trial guarantees. In *Presley*, the trial court had excluded *all* members of the public from the courtroom during voir dire, including one of the defendant's family members. (*Presley v. Georgia*, *supra*, 130 S.Ct. at p. 722.) Defendant was present and the public was allowed, but the court questioned jurors

17

at sidebar about sensitive subjects bearing on potential cause challenges. We agree that, as a general rule, the questioning of prospective jurors should be conducted in open court, with sidebar conferences reserved for particularly sensitive or prejudicial topics. However, having reviewed the record, we are satisfied that the brief bench conferences during jury selection here imposed no more than a de minimus infringement of the public trial guarantee. These brief episodes of questioning and argument at the bench did not deprive defendant of his right to a public trial.

## B.     *Cause Challenges*

Defendant claims the court erred in its rulings on challenges to three prospective alternate jurors for cause and improperly limited defense counsel's questioning of a fourth prospective juror. We find no abuse of discretion.

### 1.     *Denial of Defense Challenges*

#### a.     *Prospective Alternate Juror John B.*

During voir dire, the court questioned Prospective Alternate Juror John B. at the bench about disclosures in his questionnaire concerning child abuse. After this topic was explored, defense counsel requested permission to ask John B. "one question." He then asked whether "a person who has committed cold-blooded, premeditated murder in the commission of a robbery has forfeited his right to live and should automatically get the death penalty regardless of his circumstances?" John B. disagreed with the word "automatically" and said he would not vote for death automatically. He explained, however, that he could imagine circumstances when a murderer would forfeit the right to live, such as if the victim was murdered even when doing his or her best to cooperate. When defense counsel asserted "that is precisely what the People are going to try to prove," John B. admitted that, in that case, he would "lean very strongly" in favor of voting for death. The court interrupted the juror and asked if the prosecutor had any questions. In response to the prosecutor's questioning, John B. repeatedly stated that he would "weigh the circumstances" in deciding whether to impose the death penalty and would not

18

impose death automatically. John B. stressed that he would always take the circumstances of the case into account. He could vote for life imprisonment without parole, but he conceded that in certain circumstances, like the murder of a compliant victim, he would lean strongly toward the death penalty.

Defense counsel interposed the beginning of a question: "But if a person goes out of his way to take a robbery victim who is not resisting, and take them to another area and murder them by repeatedly stabbing them —." The court sustained an objection, and counsel rephrased the question. Directing John B.'s attention to a questionnaire response stating that a person who committed premeditated murder had " 'forfeited the right,' " defense counsel asked whether a fact pattern of premeditated murder would cause John B. to "automatically vote for death." John B. responded, "I'm going to object to the term 'automatic.' I would lean much more heavily towards it. But I mean, there are circumstances that would have to be weighed all the way around."

The next day, defendant moved to dismiss John B. for cause, arguing there was no reasonable possibility John B. would impose life imprisonment without parole under the facts of this case. The court denied the challenge. Having observed John B.'s demeanor at sidebar, the court "found him to be very thoughtful in his answers, and . . . very credible." Although John B. said he would strongly lean toward death in certain cases, the court concluded this statement was not a sufficient basis for disqualification. The court observed, "Yes, he's a strong pro-deather. But he made it very, very clear that he would be willing to look at the circumstances, although his feelings on the subject matter are very strong." After his cause challenge was denied, defendant exercised a peremptory challenge to excuse John B. and exhausted all four peremptory challenges allotted for the selection of alternate jurors. However, defense counsel did not express dissatisfaction with the jury as sworn.

"As a general rule, a party may not complain on appeal of an allegedly erroneous denial of a challenge for cause because the party need not tolerate

having the prospective juror serve on the jury; a litigant retains the power to remove the juror by exercising a peremptory challenge. Thus, to preserve this claim for appeal we require, first, that a litigant actually exercise a peremptory challenge and remove the prospective juror in question. Next, the litigant must exhaust all of the peremptory challenges allotted by statute and hold none in reserve. Finally, counsel . . . must express to the trial court dissatisfaction with the jury as presently constituted." (*People v. Mills* (2010) 48 Cal.4th 158, 186.) Defendant satisfied the first two of these requirements, but not the third. We have declined to find claims forfeited under these circumstances in cases tried before 1994, when the expression of dissatisfaction requirement was clarified in *People v. Crittenden* (1994) 9 Cal.4th 83, 121, footnote 4 (see *Mills*, at pp. 186-187); however, defendant's trial was in 1995.

Even if defendant's claim had been preserved, it would fail on the merits. Defendant first argues the court erred in limiting his attorney's questioning of John B. In general, both parties are entitled to ask prospective jurors questions "that are specific enough to determine if those jurors harbor bias, as to some fact or circumstance shown by the trial evidence, that would cause them not to follow an instruction directing them to determine a penalty after considering aggravating and mitigating evidence. [Citation.]" (*People v. Cash* (2002) 28 Cal.4th 703, 720-721.) However, "[o]ur decisions have explained that death-qualification voir dire must avoid two extremes. On the one hand, it must not be so abstract that it fails to identify those jurors whose death penalty views would prevent or substantially impair the performance of their duties as jurors in the case being tried. On the other hand, it must not be so specific that it requires the prospective jurors to prejudge the penalty issue based on a summary of the mitigating and aggravating evidence likely to be presented. [Citation.] In deciding where to strike the balance in a particular case, trial courts have considerable discretion. [Citations.]" (*Id*. at pp. 721-722.)

Defense counsel had ample opportunity to question John B. and did so at length. This questioning was cut short on only one occasion, when the court sustained an objection to counsel's question whether John B. would impose the death penalty upon a person who had moved an unresisting robbery victim to another location and then repeatedly stabbed them. This hypothetical question included several key facts about defendant's alleged crime: (1) The murder was committed during a robbery; (2) the victim did not resist; (3) the victim was moved to another location; and (4) in that location, the victim was stabbed repeatedly and killed. Given this specificity, the trial court did not abuse its discretion in concluding that the question improperly called for Prospective Alternate Juror John B. to prejudge the penalty determination based on evidence likely to be presented.

Defendant next argues substantial evidence does not support the court's denial of his challenge of John B. for cause. "A prospective juror may be challenged for cause based upon his or her views regarding capital punishment only if those views would ' "prevent or substantially impair" ' the performance of the juror's duties as defined by the court's instructions and the juror's oath. (*Wainwright v. Witt* (1985) 469 U.S. 412, 424; *People v. Crittenden*[, *supra*,] 9 Cal.4th [at p.] 121; *People v. Mincey* (1992) 2 Cal.4th 408, 456.)" (*People v. Cunningham* (2001) 25 Cal.4th 926, 975.) "If a juror's responses are conflicting or equivocal, the trial court's ruling is binding on us. [Citations.] If not, we will uphold the trial court if the ruling is fairly supported by substantial evidence in the record, giving deference to the trial court which had the opportunity to observe and listen to the juror. [Citations.]" (*People v. Holt* (1997) 15 Cal.4th 619, 651.)

Substantial evidence supports the trial court's conclusion that John B. could remain impartial and apply the law despite his personal beliefs regarding the death penalty. The trial court found John B.'s responses to be thoughtful and credible, and we defer to this assessment. (*People v. Navarette* (2003) 30 Cal.4th 458, 490; *People v. Crittenden*, *supra*, 9 Cal.4th at p. 122.) John B. repeatedly averred that

21

he would not impose the death penalty automatically, but would consider all the relevant circumstances in making a decision. Although he admitted he would lean toward death in the case of a robber who proceeded to murder a cooperative victim, he stressed that no particular penalty would be "automatic." In context, John B.'s statements appear to convey his view that the premeditated murder of an unresisting victim presents, in the abstract, a collection of aggravating circumstances that tip the balance heavily in favor of death. John B. did not rule out a different result, however, if mitigating circumstances were also taken into account.

###### b. *Prospective Alternate Juror Tracey S.*

Prospective Alternate Juror Tracey S. worked as a registered nurse with the Los Angeles County Sheriff's Department, treating inmates at the Men's Central Jail. She came in contact with deputy sheriffs but none were her friends. At sidebar, defense counsel disclosed that defendant remembered being treated by Tracey S. in the past. Defendant had seen her talking to deputies and believed she dated deputies. Defense counsel challenged Tracey S. for cause "out of an abundance of caution" and conceded the challenge was not based on "anything specific." Counsel explained that he would feel "uncomfortable" having Tracey S. as a juror given that she could encounter defendant at the jail during the trial and "we're trying to pretend he's not in custody." The court observed that Tracey S. would not have contact with defendant if she served as a juror "because she obviously wouldn't be going to work; she would be coming here." Nevertheless, the court asked if Tracey S. recognized anyone at counsel table, and she replied that she did not. The court denied the challenge. Immediately after this ruling, defense counsel declined to exercise a peremptory challenge against Tracey S. and expressly accepted the alternate jurors. Tracey S. was sworn as an alternate and eventually sat as a regular juror.

Defendant now claims the court erred in denying his challenge. Assuming this claim was not waived by defense counsel's express acceptance of the alternate

22

jurors, it fails on the merits. Tracey S. said she did not recognize anyone at the defense table. Defense counsel could not identify any specific reason why Tracey S. could not serve as a fair and impartial juror. He referred only to his discomfort, defendant's speculation, and counsel's conjecture that Tracey S.'s job, which she would be away from during trial, might alert her to defendant's custodial status. These vague and speculative objections were not sufficient to support a dismissal for cause, and the trial court's denial of the challenge is supported by substantial evidence. (See *People v. Carpenter* (1999) 21 Cal.4th 1016, 1035.)

However, defendant insists that the challenge should have been granted because, almost a month *later*, Tracey S. did see defendant at the jail. Jurors were excused from court for one day after the close of evidence in the guilt phase. Tracey S. went to work that day and saw defendant standing in line outside the jail's clinic with a group of inmates. They did not speak. Tracey S. walked by defendant, had no more contact with him, and did not try to find out more about him. Thus, while she learned that defendant was in custody, she knew nothing else about him, and she did not remember having ever treated him. Defense counsel asked Tracey S. several questions about the incident, and she repeatedly said it would not affect her ability to serve as a juror. At the court's request, she also agreed not to mention the sighting to other jurors. Counsel did not move to dismiss Tracey S. or make any attempt to show she was disqualified from serving as a juror. "Plainly, if a defendant desires the trial court to fashion an appropriate remedy under these circumstances, the request must be timely to afford the opportunity to rule when the ruling will be meaningful. [Citation.]" (*People v. Ramos* (1997) 15 Cal.4th 1133, 1160.) Because no objection was made below, to the extent defendant contends the court erred in failing to discharge Tracey S. from the jury, the claim has been forfeited. (*Ibid.*; see also § 1089 [permitting discharge of a juror at any time "upon . . . good cause *shown to the court*" (italics added)].)

23

Even if the claim had been preserved, it would fail on the merits. A juror may be discharged if, at any time before or after final submission of the case, the court upon good cause finds the juror "unable to perform his or her duty." (§ 1089.) We generally uphold a trial court's decision regarding discharge if there is any substantial evidence to support it, although, if a juror is discharged, her inability to perform as a juror "must ' "appear in the record as a demonstrable reality." ' [Citation.]" (*People v. Marshall* (1996) 13 Cal.4th 799, 843.) The record does not support defendant's claim that Tracey S.'s ability to serve was compromised because she saw him in custody. Tracey S. immediately reported the incident to the court, repeatedly assured the court the incident would have no effect on her decisionmaking, and agreed to say nothing about it to other jurors.**8**

### 2. *Grant of Prosecution Challenge to Prospective Alternate Juror Janice S.*

In her questionnaire, Prospective Juror Janice S. wrote that she "really [didn't] believe in the death penalty," but she thought she could set her beliefs aside and impose it if she thought it was appropriate. During voir dire, however, Janice S. said that she did not believe she had the "right to say . . . somebody else should die. I can't make that decision" The court asked if Janice S. could think of a set of circumstances in which she could impose the death penalty for a person convicted of first degree murder committed in the course of a robbery. Janice S. said she could not, although she had written on her questionnaire that she could do so. Janice S. explained: "[N]ow I'm thinking. I had time to think. And no, I couldn't say — even if they did all that — that I still couldn't say that I could sentence this person to death." When the court asked again, "are you telling us . . . you can't see a set of circumstances where you could find yourself personally

---

**8** Although the defense was "trying to pretend" that defendant was not in custody, few jurors would find it remarkable that a defendant facing the death penalty would be in custody during trial. We note further that during the penalty phase defendant refused to wear civilian clothing. Thus, his custody status was evident.

24

voting to put someone to death," Janice S. answered, "Right. I couldn't. No, I could not." Later, the prosecutor challenged Janice S. for cause. Defense counsel asked for an opportunity to attempt to rehabilitate her. In the alternative, he opposed the challenge based on Janice S.'s questionnaire responses expressing a willingness to set aside her beliefs and impose the death penalty if appropriate. The court sustained the challenge without allowing further inquiry.

A prospective juror may be excluded for cause without compromising a defendant's right to trial by an impartial jury if the juror's views on capital punishment "would 'prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath.' " (*Wainwright v. Witt*, *supra*, 469 U.S. at p. 424; see also *People v. Rodrigues* (1994) 8 Cal.4th 1060, 1146.) "A prospective juror is properly excluded if he or she is unable to conscientiously consider all of the sentencing alternatives, including the death penalty where appropriate. [Citations.]" (*People v. Jones* (2003) 29 Cal.4th 1229, 1246.) "Generally, the qualifications of jurors challenged for cause are matters within the wide discretion of the trial court, seldom disturbed on appeal. [Citations.] There is no requirement that a prospective juror's bias against the death penalty be proven with unmistakable clarity. [Citations.] Rather, it is sufficient that the trial judge is left with the definite impression that a prospective juror would be unable to faithfully and impartially apply the law in the case before the juror. [Citations.] 'On review, if the juror's statements are equivocal or conflicting, the trial court's determination of the juror's state of mind is binding. If there is no inconsistency, we will uphold the court's ruling if it is supported by substantial evidence. [Citations.]' (*People v. Carpenter* (1997) 15 Cal.4th 312, 357.)" (*Jones*, at pp. 1246-1247.)

The record amply supports the trial court's dismissal of Janice S. for cause. Although her questionnaire responses were somewhat ambiguous, Janice S. unequivocally stated at voir dire that she had considered the matter further and concluded she could not vote to impose the death penalty under *any*

25

circumstances. This clear admission established that Janice S. could never impose the penalty sought by the prosecution in this capital case. Accordingly, the trial court properly dismissed Janice S. because her views would have substantially impaired her ability to perform her duties as a juror.

Defendant also claims the court violated his constitutional rights by refusing to allow defense counsel to question Janice S. further on her views about the death penalty. Defendant speculates that further questioning might have shown that Janice S. could have set aside her strong views and fulfilled her duties as a capital juror. However, as we have repeatedly stated, "[t]he court has discretion to refuse to allow defense counsel to question jurors for the purpose of rehabilitation if their 'answers made their disqualification unmistakably clear . . . .' (*People v. Bittaker*, *supra*, 48 Cal.3d at p. 1085, citing *People v. Nye* (1969) 71 Cal.2d 356, 364.)" (*People v. Carpenter*, *supra*, 15 Cal.4th at p. 355; see also *People v. Samayoa* (1997) 15 Cal.4th 795, 823.) We find no abuse of discretion. After reflection, Janice S. candidly admitted that she could not vote to impose the death penalty under any circumstances. Her clearly stated views disqualified her from jury service.

Defendant nevertheless insists the questioning of Janice S. was constitutionally inadequate under *Morgan v. Illinois* (1992) 504 U.S. 719. Not so. *Morgan* simply held that general questions about a juror's ability to be fair and follow the law are not sufficient to detect those in the venire who would automatically vote for or against death. (*Id*. at pp. 734-735.) Questions about death penalty biases must be specific enough that they require potential jurors to consider whether they have such strong views about capital punishment that they could not follow the law. (*Id*. at pp. 735-736.) The trial court's questions directly involving the death penalty were sufficiently specific. As the Supreme Court observed in *Morgan*, "such jurors — whether they be unalterably in favor of, or opposed to, the death penalty in every case — by definition are ones who cannot perform their duties in accordance with law . . . ." (*Id*. at p. 735.)

### 3. *Limited Questioning of Prospective Alternate Juror Duvall G.*

Finally, defendant claims the court erred in refusing to allow defense counsel to question Prospective Alternate Juror Duvall G. Before jury selection, the court announced its intention to question the jurors itself but also allow each side one hour for the attorneys to "hone in on areas that they really believe are necessary." No objections were raised to this procedure. Each prospective juror had completed a detailed, 36-page questionnaire, and the record reflects that the court questioned each juror individually. After the court questioned Duvall G., defense counsel requested leave to ask "a couple" of questions. The court declined, remarking that the attorneys were "both out of time." Defendant did not challenge Duvall G. for cause or exercise a peremptory challenge against him. Duvall G. was sworn as an alternate juror and substituted onto the jury during the guilt phase.

In his questionnaire, Duvall G. revealed that he had been physically and mentally abused by his father. When the court asked about this abuse at sidebar, Duvall G. explained that his mother had abandoned the family, leaving Duvall G. with his alcoholic father. Duvall G. remarked on the experience: "To me, it's no big deal. I'm here. I work every day. . . . [¶] I never had any psychological counseling. So I guess I'm just a regular kind of guy, you know." Duvall G. thought he could objectively weigh evidence about similar abuse, "because I never think about it. It doesn't bother me." Asked if a person subjected to such abuse "can still make the right choices in life," Duvall G. responded, "[of] course they can." He believed that if an abused person later made "wrong choices in life," they would be accountable for such choices. He explained: "It's not like they're still being abused. To me, it's not that deeply rooted . . . . That's just my personal opinion." Despite this opinion, Duvall G. averred that he could consider evidence of abuse as a factor in causing a person to make bad decisions.

Duvall G. was arrested for joyriding and driving while intoxicated when he was 13 or 14 years old. When the court asked about this experience, Duvall G. confirmed that he had been treated fairly by the criminal justice system. He regretted the incident because he could have hurt someone.

Duvall G.'s questionnaire also mentioned that he had been the victim of a burglary and a robbery. In response to the court's questions, Duvall G. disclosed that two men had robbed him at knifepoint eight or nine years earlier. He did not contact the police because robberies happened "all the time" in that neighborhood, and he thought "it was, like, no big deal as long as I didn't get hurt. That's what you pray for, not to get hurt." Also, he did not think the police could catch the robbers, who ran away on foot, "and they only got a couple dollars." Duvall G. did not try to find the culprits. He affirmed that he could be fair in the present case even though it involved an allegation of robbery with a knife. Duvall G. also stated in his questionnaire that he could find defendant not guilty if the evidence did not support the charges, and he commented, "Robbery is not murder."

In his questionnaire, Duvall G. agreed that it is important to know a person's life circumstances when deciding between the death penalty and life imprisonment, and he said he could follow an instruction directing him to consider these circumstances. On voir dire by the court, Duvall G. affirmed that he could give fair and objective consideration to all the evidence bearing upon penalty, and he could personally impose either penalty depending on what the evidence showed.

Defendant now contends the trial court's refusal to allow further questioning by defense counsel rendered the trial fundamentally unfair. Because defendant did not challenge Duvall G. for cause, did not exercise a peremptory challenge against him, and expressly accepted the panel of alternate jurors sworn, he has forfeited any claim of error regarding Duvall G.'s suitability as a juror. (*People v. Burgener* (2003) 29 Cal.4th 833, 866; *People v. Ramos*, *supra*, 15 Cal.4th at p. 1160.) His argument also fails on the merits.

28

"The trial court . . . has a duty to restrict voir dire within reasonable bounds to expedite the trial. [Citation.]" (*People v. Avila* (2006) 38 Cal.4th 491, 536.) We review a trial court's limitations on voir dire for abuse of discretion. (*People v. Benavides*, *supra*, 35 Cal.4th at p. 88; see Code Civ. Proc., § 223.) No such abuse appears here. The court thoroughly questioned Duvall G. on his background and relevant experiences and probed his ability to be a fair and impartial juror. Defense counsel never told the trial court what additional questions he sought to ask, what subjects needed to be explored further, or why the information elicited from Duvall G.'s detailed questionnaire and the court's questioning was not sufficient to allow him to exercise his challenges intelligently. Defendant did not ask the court to pose further questions. As a result, defendant's argument that the time limits on attorney voir dire deprived him of an opportunity to establish that Duvall G. could not serve as a fair and impartial juror is purely speculative. (*People v. Roldan* (2005) 35 Cal.4th 646, 693, disapproved on another ground in *People v. Doolin* (2009) 45 Cal.4th 390, 421, fn. 22.) Duvall G.'s responses in the questionnaire, and in court, consistently showed that he was qualified to serve as a juror. Defendant had sufficient information from the questionnaire and in-court voir dire to exercise his challenges intelligently. The trial court did not abuse its discretion by denying defense counsel's request to question this prospective juror further. (See *Roldan*, at p. 694.)

C.    *Admission of Victim Photographs*

During the guilt phase, the prosecution introduced People's exhibit No. 14, which held four mounted photographs of the murder victim, Soy Sung Lao. The two photographs on the left depicted Lao in life, wearing a University of Southern California sweatshirt. The two on the right were taken by the coroner during Lao's autopsy. When the prosecutor used this exhibit in questioning Sergeant Tiller, Officer Schmidt, and Debra Tomiyasu, he left one of the autopsy photos partially uncovered, revealing only Lao's face. The other autopsy photo was covered entirely. Defendant did not object to the use of the exhibit with any of

29

these witnesses. During the testimony of Ty Ngov, the victim's brother-in-law, defense counsel objected to a display of the partially covered coroner's photograph. In response, the prosecutor covered the photograph entirely, leaving exposed only the photographs of Lao in life. Defense counsel agreed to stipulate that Lao was the person shown in the covered photograph. The exhibit remained in this condition, with both autopsy photos covered, when the prosecutor displayed it in questioning Lao's sister and a crime scene technician. Defendant did not object to these displays of the partially covered exhibit. During his examination of the forensic pathologist, the prosecutor uncovered the autopsy photos and, without objection, displayed the full exhibit to the jury. In addition to marking the locations of Lao's stab wounds on a blank body chart, the pathologist circled some specific wounds on one of the autopsy photographs in the exhibit.

Defendant now claims the trial court abused its discretion when it admitted People's exhibit No. 14 into evidence. Although defense counsel did not object to the use of the exhibit with seven separate witnesses, he argued after the close of testimony in the guilt phase that the exhibit should be excluded from evidence because the juxtaposition of autopsy photos with pictures of the victim in life was more prejudicial than probative. This objection should have been made during the pathologist's testimony, when all the photographs were unveiled for the jury, but it was not. "Because defendant did not object at the time the photographs were used in questioning the witnesses, he failed to preserve the issue for appeal. Although he later raised an objection, that objection was not sufficiently timely to preserve the issue. The requirement that an objection to evidence be timely made is important because it 'allows the court to remedy the situation before any prejudice accrues.' [Citation.]" (*People v. Boyette* (2002) 29 Cal.4th 381, 423-424.)

Even if the claim had been preserved, the evidence was properly admitted. "The admission of photographs of a victim lies within the broad discretion of the trial court when a claim is made that they are unduly gruesome or inflammatory. [Citations.] The court's exercise of that discretion will not be disturbed on appeal

30

unless the probative value of the photographs clearly is outweighed by their prejudicial effect. [Citations.]" (*People v. Crittenden*, *supra*, 9 Cal.4th at pp. 133-134.) The photographs in the exhibit were relevant to corroborate eyewitness identifications of Lao and to illustrate expert forensic testimony. Defendant does not contend the autopsy photographs were especially gruesome. He objects that the *juxtaposition* of photos showing the victim in life and in death was unfairly prejudicial because this combination would likely evoke sympathy for the victim. "We have described the 'prejudice' referred to in Evidence Code section 352 as characterizing evidence that uniquely tends to evoke an emotional bias against a party as an individual, while having only slight probative value with regard to the issues. [Citation.]" (*Crittenden*, at p. 134; see also *Vorse v. Sarasy* (1997) 53 Cal.App.4th 998, 1008 ["Evidence is not prejudicial, as that term is used in a section 352 context, merely because it undermines the opponent's position or shores up that of the proponent"].) Each photo was properly admitted. All evidence is to be considered as a whole. The mere fact that four properly admitted photographs were mounted on a single board does not approach the threshold for a section 352 exclusion. After seven witnesses had been questioned about People's exhibit No. 14 without objection from the defense, the trial court did not abuse its discretion in admitting the exhibit itself into evidence.

### D. *Testimony of Lavette Gilmore*

Defendant complains the trial court made several errors in regard to the testimony of Lavette Gilmore, the hair stylist who identified defendant as having been in the doughnut shop shortly before the murder. We find no prejudicial error.

#### 1. *Nonresponsive Testimony*

During direct examination, after Gilmore described the man she saw sitting alone at one of the doughnut shop tables, the prosecutor asked what drew her attention to this person. She responded that he gave her a "funny feeling" and his sitting there "[j]ust didn't feel right." Defense counsel asked the court to strike the phrase "funny feeling" because Gilmore's "suspicions or feelings" were not

31

relevant. The court overruled the objection and noted that Gilmore's remark "explain[ed] why she paid attention" to the man in the shop. Gilmore also testified, without objection, that defendant's appearance drew her suspicion because "[h]e looked like he shouldn't have been there. He looked rugged." He was thin, needed a haircut, and "didn't look clean at all." When the prosecutor asked Gilmore to identify defendant, in court, as the man she saw in the doughnut shop, she responded, "He looks so clean and nice now and healthy." She could not say he was the same person. The prosecutor then questioned Gilmore about the 1993 photographic lineup in which she identified defendant's profile photo. Asked how she expressed her identification to the officer, Gilmore replied that she remembered the man's eyes, nose, cap, facial hair, and the way he tried to hide his face. She explained that she focused her attention on the man in the shop because she "had a lot of money in [her] back pocket" from having worked a full day at the salon. Defense counsel interrupted, objecting to testimony about money in Gilmore's pocket and her "inchoate fears." The court responded by directing the prosecutor to ask his next question. Defense counsel did not request a ruling on his objection or move to strike Gilmore's testimony as nonresponsive.

Defendant now claims the court erred in failing to strike Gilmore's testimony sua sponte because it was nonresponsive and more prejudicial than probative. Specifically, defendant contends the testimony asked the jury to infer that he had a predisposition to commit robbery. He also argues Gilmore's testimony was inadmissible as a lay opinion about whether the man she saw in the doughnut shop intended to commit a robbery.

Defendant forfeited these claims by failing to obtain a ruling on his objection and failing to move that Gilmore's testimony be stricken. " 'In the absence of an erroneous ruling on an objection or request that a nonresponsive answer be stricken and the jury instructed to disregard it, there is no error.' (*People v. Harris* [(1989)] 47 Cal.3d [1047,] 1089.)" (*People v. Jackson* (1996) 13 Cal.4th 1164, 1214.) Defense counsel's vague objection to what he

characterized as Gilmore's "inchoate fears" was not sufficient to preserve a claim of error for appeal. "A nonresponsive answer is properly the subject of a motion to strike (Evid. Code, § 766), not an objection." (*People v. Bell* (2007) 40 Cal.4th 582, 611, fn. 11.)

In any event, defendant's claims fail on the merits. Gilmore did not express an opinion about whether the man was a potential robber. She gave no character evidence about defendant's propensity to act in a particular way. She merely described her state of mind upon seeing a "rugged"-looking man sitting alone in the shop. The testimony was relevant to show that she paid particular attention to the man and explain why she did so. As to defendant's challenge under Evidence Code section 352, the evidence was not *unduly* prejudicial, meaning it did not " 'uniquely tend[] to evoke an emotional bias against the defendant as an individual' " while having little bearing on disputed issues. (*People v. Karis* (1988) 46 Cal.3d 612, 638.) " 'In applying section 352, "prejudicial" is not synonymous with "damaging." ' [Citation.]" (*Ibid*.) The trial court did not err in permitting the testimony.

### 2. *Trial Testimony from Photographic Lineup*

After she identified defendant's profile in August 1993 from a photographic lineup, Gilmore was asked to attend a live lineup that October. At trial, Gilmore explained that she did not identify defendant in the live lineup, even though she recognized him among the suspects, because she was frightened. Because his appearance had changed so much by the time of trial, she also could not identify defendant in court as the man she saw in the doughnut shop.

During Gilmore's direct examination, the prosecutor sought to reconstruct the live lineup by showing her photographs of that lineup. Defense counsel objected to the questioning because Gilmore did not identify defendant at the live lineup. When pressed to state the legal grounds for his objection, defense counsel argued that, given the passage of time, there was no foundation Gilmore had the ability to make an in-court identification from photographs of the lineup. The

33

court overruled the objection, noting that counsel could explore the subject on cross-examination. When questioning resumed, the prosecutor showed Gilmore three photographs from the live lineup. She selected defendant's photograph and said it depicted the person she had recognized at the lineup but failed to identify. Defense counsel interrupted and asked that the record reflect that the exhibit shown to Gilmore also contained a large single photograph of defendant, mounted below two pictures of the live lineup. He raised no objection to use of the exhibit, however.

On appeal, defendant claims the ruling permitting this line of questioning abridged various constitutional rights, including his right to counsel. No constitutional violation occurred. Defendant was represented by counsel when the live lineup was conducted and, of course, at trial. Moreover, there is no Sixth Amendment right to counsel at a photographic lineup. (*United States v. Ash* (1973) 413 U.S. 300, 321.)

Defendant also argues for the first time in his reply brief that the identification procedure violated due process because the photographic exhibit shown to Gilmore was overly suggestive. The exhibit in question displayed two pictures of the live lineup and a third, of the same size, showing only defendant's head and shoulders. Because counsel did not object or seek to prevent questioning on this exhibit on the ground that it was unduly suggestive, this claim is forfeited on appeal. In any event, defendant has not established error. "[F]or a witness identification procedure to violate the due process clauses, the state must, at the threshold, improperly suggest something to the witness — i.e., it must, wittingly or unwittingly, initiate an unduly suggestive procedure." (*People v. Ochoa* (1998) 19 Cal.4th 353, 413.) Defendant's complaint that the exhibit was unduly suggestive misses the point because the exhibit was not used as part of a "witness identification procedure." The prosecutor did not use the challenged exhibit to obtain an identification from Gilmore. He did not ask her to identify which picture depicted the man she saw in the doughnut shop. Rather, the prosecutor

34

asked Gilmore whether the photos showed the lineup she attended. He then asked her to point out the man she had recognized but declined to identify. For this purpose, it did not matter whether the exhibit displayed defendant prominently. The witness testified she had recognized defendant when she saw him in person. Her testimony reflected that, at trial, she remained able to identify the same man. There is no indication that her trial testimony was influenced by the additional photo of defendant mounted on the exhibit.

### 3. *Limitation of Cross-examination*

" '[A] criminal defendant states a violation of the Confrontation Clause by showing that he was prohibited from engaging in otherwise appropriate cross-examination designed to show a prototypical form of bias on the part of the witness, and thereby, "to expose to the jury the facts from which jurors . . . could appropriately draw inferences relating to the reliability of the witness." ' (*Delaware v. Van Arsdall* (1986) 475 U.S. 673, 680, quoting *Davis v. Alaska* (1974) 415 U.S. 308, 318.) However, not every restriction on a defendant's desired method of cross-examination is a constitutional violation. Within the confines of the confrontation clause, the trial court retains wide latitude in restricting cross-examination that is repetitive, prejudicial, confusing of the issues, or of marginal relevance. [Citations.] California law is in accord. [Citation.] Thus, unless the defendant can show that the prohibited cross-examination would have produced 'a significantly different impression of [the witnesses'] credibility' (*Van Arsdall*, *supra*, 475 U.S. at p. 680), the trial court's exercise of its discretion in this regard does not violate the Sixth Amendment. [Citation.]" (*People v. Frye* (1998) 18 Cal.4th 894, 946, disapproved on another ground in *People v. Doolin*, *supra*, 45 Cal.4th at p. 421, fn. 22.)

Defendant complains the court improperly restricted his cross-examination of Gilmore by sustaining objections to three areas of questioning. There was no error.

Defense counsel began his cross-examination of Gilmore by challenging her intentional identification of the wrong person at the live lineup. Counsel asked, without objection, "What if that man was convicted and was put in the gas chamber?" Gilmore responded that she "wasn't thinking like that" at the time. After further probing, counsel asked whether Gilmore had "put down something that wasn't true in something as crucial as a capital murder case." The court sustained the prosecutor's objection that the question assumed Gilmore knew the proceedings would be prosecuted as a capital case. This objection was well taken. Defendant was not even arraigned on the final charges until November 19, 1993, a month *after* the live lineup. Gilmore testified she knew someone had been murdered, but there is no support for defendant's overly broad assertion that it is "common knowledge" that convicted murderers are subject to the death penalty in California.[9] Indeed, if there were such common knowledge, the jurors would have held it too, and presumably could have weighed that factor in assessing Gilmore's credibility. Defense counsel's point, although not properly presented, would nonetheless have been made.

Next, defendant challenges rulings sustaining two objections to argumentative questions. In probing Gilmore about her intentional misidentification at the live lineup, defense counsel asked how she would have felt if she had been the person who was wrongly identified. The trial court sustained an objection to the question as argumentative. This ruling was proper. Gilmore's state of mind about how she would have felt to be misidentified was not relevant to any disputed issue in the trial or to her credibility as a witness. The question was also cumulative, because Gilmore was asked many questions about the circumstances surrounding the misidentification and her lack of candor in making it. Later, defense counsel questioned Gilmore about the description she gave to

---

[9]     Defendant points out that an August 1993 newspaper article stated that Lao's murderer "could" face the death penalty or life imprisonment without parole, but he concedes there is no evidence suggesting Gilmore read the article.

36

Officer Nick Pepper at the crime scene. Counsel read a description and asked if Gilmore recalled describing the man in the doughnut shop as clean-shaven. She responded, "No. He wasn't no clean-shaved person [*sic*]." Defense counsel prefaced his next question with the statement, "Yeah, I know, all these pictures you have looked at —," and the prosecutor interrupted to object.

The trial court properly sustained the objection because counsel's statement was clearly argumentative. "An argumentative question is a speech to the jury masquerading as a question. The questioner is not seeking to elicit relevant testimony. Often it is apparent that the questioner does not even expect an answer." (*People v. Chatman* (2006) 38 Cal.4th 344, 384.) Counsel was not asking a question; he was telling the jury his own explanation for why Gilmore's description had changed. The court's rulings sustaining objections to argumentative questions did not infringe defendant's constitutional rights. " '[T]he Confrontation Clause guarantees an *opportunity* for effective cross-examination, not cross-examination that is effective in whatever way, and to whatever extent, the defense might wish.' [Citation.]" (*Delaware v. Van Arsdall*, *supra*, 475 U.S. at p. 679.)

### E.   *Testimony of Detective Richard Cohen*

Next defendant claims the trial court erred in allowing Detective Richard Cohen to testify why he considered defendant to be a suspect in Lao's murder.

Detective Cohen was twice called to the witness stand. He testified first about his interview of defendant in connection with the burglary of the St. Frances Xavier Cabrini Church. Defendant told Detective Cohen he had sometimes been living near the Southwest Bowl. Later, when Detective Jacques LaBerge was investigating the robbery of Samuel Draper at the Southwest Bowl, Cohen remembered that defendant lived near there as "a transient," and he shared this information with LaBerge.

Later in the trial, Detective Cohen was recalled to the stand to describe his meeting in June 1993 with LaBerge and Sergeant Lobo. Cohen testified that he

37

saw a poster concerning a murder in Gardena and, based on the photograph and other information stated in the poster, Cohen thought he might have a lead on a possible suspect. When the prosecutor asked whether Detective Cohen had developed "any sort of suspicions" after looking at the composite picture and learning the circumstances of the Gardena murder, defense counsel objected that the detective's state of mind was not relevant. He argued that Cohen should not be allowed to give an opinion that the composite looked like defendant, or was similar to defendant's appearance when Cohen interviewed him after the church burglary. The prosecutor explained that he was trying to establish how, despite initial delays, the investigation ultimately focused on defendant. He expected Detective Cohen would testify both that the composite resembled defendant and that the circumstances of the crimes revealed "the same kind of MO." The court found that the evidence had probative value to explain how, after a long delay, law enforcement officers focused on defendant as a suspect. The court agreed that Cohen's opinion as to whether the composite looked like defendant was irrelevant, but it allowed evidence showing Cohen's memory of defendant was triggered by similarities in the modus operandi of the crimes. After this ruling, Detective Cohen testified, without objection, that he started to consider defendant a possible suspect in the Gardena murder because the composite "kind of resembled" what defendant looked like when Cohen interviewed him and because Cohen knew that defendant "had been hanging around the Southwest Bowl and possibly committing crimes there."

Defendant now complains this testimony was inadmissible as lay opinion. "A lay witness may testify to an opinion if it is rationally based on the witness's perception and if it is helpful to a clear understanding of his testimony. (Evid. Code, § 800.)" (*People v. Farnam* (2002) 28 Cal.4th 107, 153.) The challenged testimony was based on the detective's perceptions and was helpful for the jury to understand how Cohen came to suspect defendant was connected to the Gardena homicide. It was important for the prosecution to establish how the investigation

38

suddenly came to focus on defendant eight months after the murder, with defendant jailed for much of this time for other crimes. The testimony was not unduly prejudicial, and Tomiyasu had already testified about defendant's resemblance to the composite picture. The jury was, of course, free to draw its own conclusion. The trial court did not abuse its discretion in permitting the testimony.

### F.     *Testimony of Ella Ford*

Next, defendant claims the trial court violated his rights to due process, the assistance of counsel, and a reliable penalty determination by admitting testimony about Ella Ford's photographic identification, made just a month before trial, and by permitting her to make an in-court identification.

On the afternoon of Lao's murder, Officer Nick Pepper interviewed Ella Ford at the crime scene. Ford described seeing a tall, dark-skinned, bearded male, wearing a black T-shirt that displayed the continent of Africa. He was running through the parking lot, away from the Donut King. Ford saw the man's face as he looked back toward the shop. She did not mention seeing anything in his hands.

On September 27, 1993, defendant requested that a live lineup be conducted pursuant to *Evans v. Superior Court* (1974) 11 Cal.3d 617 (*Evans*). The request did not specifically name Ford but, after listing certain names, called for the attendance of "any other witness who observed any suspect associated with the 10-24-92 homicide." The court granted the request, and several witnesses attended the live lineup on October 19, 1993. When a law enforcement officer attempted to bring Ford to the lineup, however, she refused to go. In her trial testimony, Ford explained she did not want to attend the lineup because she was afraid of possible retaliation if the person she had seen was affiliated with a gang. The police tried to contact her other times in the remainder of 1993 and 1994, but she remained reluctant to talk with them. On January 6, 1995, Sergeant Lobo and the prosecutor visited Ford's house to interview her again about the homicide.

During this meeting, Sergeant Lobo showed Ford a lineup of six photographs. Before Ford viewed the photographs, Lobo presented her with a standardized form explaining that she was not obligated to identify anyone. Lobo did not indicate that Ford should make an identification, nor did he suggest that the person she saw in the parking lot was included in the lineup. Ford chose defendant's photograph. She wrote on the form that this photograph " 'look[ed] like the person [she] saw the day of the incident more so than anyone else in the six-pack file.' " Ford was "90 percent, not 100 percent" certain defendant's photograph was that of the person she saw. She was "almost sure."

Defendant filed a pretrial motion to exclude evidence of this photographic identification, and any possible in-court identification by Ford, on the ground that Ford had not attended the *Evans* lineup. He argued the defense should have been notified before the police sought a photographic identification from Ford. If notice had been given, the defense could have requested that another live lineup be conducted, or could have been present when Ford viewed the photographs. As a sanction, defense counsel asked the court to suppress evidence of Ford's identification from the photographic lineup. He also asked that the court either suppress any in-court identification or hold an Evidence Code section 402 hearing to determine if Ford could make an identification independent of the photographs. Alternately, counsel asked the court to admonish the jury that the defense should have been notified before photographs were shown to Ford, and that they should consider the People's failure to give such notice in deciding the accuracy of the identification. The prosecutor responded that law enforcement officers had made several unsuccessful attempts to contact Ford, who only recently agreed to speak with them. He argued that the passage of time, Ford's reluctance to cooperate with the police, and inconsistencies between her statements were all proper subjects for cross-examination but not grounds for excluding the identifications.

The court denied the motion, finding the officers had no obligation to contact defense counsel before showing Ford a photographic lineup. Although

40

Ford was arguably included within the scope of the order for an *Evans* lineup, the court concluded that striking her identification would be too harsh a sanction. It agreed, however, to modify the pattern jury instruction concerning eyewitness testimony. As modified, the version of CALJIC No. 2.92 read to the jury stated that, among other factors, the jury could consider "[t]he failure of a witness to attend a live line-up" in assessing the accuracy of that witness's identification. Defendant now argues that "under the totality of the circumstances" the admission of Ford's identification testimony violated his rights to due process, the assistance of counsel, and a reliable penalty determination. There was no constitutional violation.

Defendant's complaints about the photographic identification lack merit. First, as noted, the absence of defense counsel at Sergeant Lobo's pretrial meeting with Ford is of no constitutional moment because the United States Supreme Court has long held that the Sixth Amendment does not guarantee a criminal defendant the right to counsel at a photographic lineup. (*United States v. Ash*, *supra*, 413 U.S. at p. 321.)

Second, despite defendant's bare assertions to the contrary, there is no evidence that the identification process was so unreliable as to violate due process. "In order to determine whether the admission of identification evidence violates a defendant's right to due process of law, we consider (1) whether the identification procedure was unduly suggestive and unnecessary, and, if so, (2) whether the identification itself was nevertheless reliable under the totality of the circumstances, taking into account such factors as the opportunity of the witness to view the suspect at the time of the offense, the witness's degree of attention at the time of the offense, the accuracy of his or her prior description of the suspect, the level of certainty demonstrated at the time of the identification, and the lapse of time between the offense and the identification. [Citations.]" (*People v. Cunningham*, *supra*, 25 Cal.4th at p. 989.) If the answer to the first question is "no," because we find that the challenged procedure was not unduly suggestive,

41

our inquiry into the due process claim ends. (*People v. Ochoa*, *supra*, 19 Cal.4th at p. 412.) Defendant does not claim the photographic lineup or the circumstances of its presentation to Ford were unduly suggestive. Instead, he focuses on discrepancies in Ford's statements to police at the crime scene, at the January 1995 meeting, and at trial, and he argues these inconsistencies demonstrate that Ford's identification is unreliable. The accuracy of Ford's identification was a question for the jury. Inconsistencies in her descriptions of the man she saw, and in her accounts of her activities on the day of the murder, are matters affecting the weight of her eyewitness testimony, not its admissibility. (*People v. Williams* (1973) 9 Cal.3d 24, 37, disapproved on another ground in *People v. Cromer* (2001) 24 Cal.4th 889, 901, fn. 3.) Because defendant has not shown that the identification procedures were impermissibly suggestive, his due process claim fails. (*People v. DeSantis* (1992) 2 Cal.4th 1198, 1222.)

Finally, the Constitution does not require exclusion of eyewitness testimony as a sanction for a witness's failure to attend a lineup. In *Evans*, *supra*, 11 Cal.3d at page 625, we held that "due process requires in an appropriate case that an accused, upon timely request therefor, be afforded a pretrial lineup in which witnesses to the alleged criminal conduct can participate." Defendant was given his pretrial lineup upon request. Due process was satisfied. Although defendant did not list Ford among the specific witnesses he wanted to attend the lineup, police officers notified her and tried to have her participate. She refused to go and refused to have any contact with law enforcement about the case for almost two years. Ford's existence as a witness was known from the crime scene police reports. There is no indication the defense was prevented from contacting her. Indeed, there is no indication of any bad faith on the part of the police or the prosecution.

Under these circumstances, the trial court had discretion to fashion a remedy short of excluding the witness's identification altogether. Addressing a similar situation, the Court of Appeal in *People v. Fernandez* (1990) 219

42

Cal.App.3d 1379, 1384-1385, approved of an instruction that told the jury it could view "with caution" the testimony of an eyewitness who had failed to attend a live lineup. The trial court fashioned a similar remedy here when it modified CALJIC No. 2.92. This remedy was an appropriate exercise of the court's discretion. The court did not err in admitting testimony about Ford's in-court and out-of-court identifications of defendant.

### G. *Instructional Error Claims*

#### 1. *CALJIC Nos. 2.50, 2.50.1, and 2.50.2*

The jury heard about defendant's involvement in several uncharged petty crimes. These included: (1) the theft of raffle tickets from Joe Vaouli's car; (2) the theft of a pie from a church, which led to defendant's arrest and interview with Detective Cohen; (3) the possession and apparent use of rock cocaine outside the Hilltop Motel, which led officers to recognize defendant's clothing and gym bag from the homicide; and (4) the burglary of an automobile in Gardena nine days after Lao's murder, which led to defendant's arrest and the booking photos later shown to witnesses.

Before trial, the prosecutor explained that he wanted to introduce evidence of these uncharged crimes to show when defendant was in custody and to trace the course of the investigation. Defense counsel agreed that "all" of this evidence should be admitted because defendant's appearance and state of mind during this period were "relevant and in issue." Counsel further stated that he was agreeing to the admission of uncharged crimes evidence "for tactical reasons," explaining, "I think the jury needs a complete picture of what Lester Virgil looked like at various times, to make a determination of guilt or innocence on the various charges." So long as no mention was made of defendant's custody in a state prison, defense counsel stated he had "no opposition to [the prosecutor] bringing out the various arrests for the offenses he's talking about, even though they are uncharged offenses."

43

"Evidence that a defendant has committed crimes other than those currently charged is not admissible to prove that the defendant is a person of bad character or has a criminal disposition; but evidence of uncharged crimes is admissible to prove, among other things, the identity of the perpetrator of the charged crimes, the existence of a common design or plan, or the intent with which the perpetrator acted in the commission of the charged crimes. [Citation.] Evidence of uncharged crimes is admissible to prove identity, common design or plan, or intent only if the charged and uncharged crimes are sufficiently similar to support a rational inference of identity, common design or plan, or intent." (*People v. Kipp* (1998) 18 Cal.4th 349, 369.)

In light of his trial counsel's express consent, defendant does not claim the admission of uncharged crimes evidence was error in itself. Instead, he takes issue with the court's instructions pursuant to CALJIC Nos. 2.50, 2.50.1, and 2.50.2 regarding the standard of proof required for the uncharged crimes.[10] Defense

---

[10] The version of CALJIC 2.50 read to the jury stated: "Evidence has been introduced for the purpose of showing that the defendant committed crimes other than that for which he is on trial. Such evidence, if believed, was not received and may not be considered by you to prove that the defendant is a person of bad character or that he has a disposition to commit crimes. Such evidence was received and may be considered by you only for the limited purpose of determining if it tends to show the identity of the person who committed the crime, if any, of which the defendant is accused. For the limited purpose for which you may consider such evidence, you must weigh it in the same manner as you do all other evidence in the case. You are not permitted to consider such evidence for any other purpose."

As read to the jury, the companion instructions stated: "Within the meaning of the preceding instruction, such other crime or crimes purportedly committed by a defendant must be proved by a preponderance of the evidence. You must not consider such evidence for any purpose unless you are satisfied that the particular defendant committed such other crime or crimes. The prosecution has the burden of proving these facts by a preponderance of the evidence." (CALJIC No. 2.50.1.) "Preponderance of the evidence means evidence that has more convincing force and the greater probability of truth than that opposed to it. If the evidence is so evenly balanced that you are unable to find that the evidence

counsel objected that instruction with CALJIC No. 2.50 was misleading because no evidence had been presented that the crimes were committed based on a common plan or scheme. When the court agreed there was no evidence presented of a common method or plan connecting the uncharged and charged offenses, defense counsel suggested that the instruction be modified so that it advised the jury it could use the uncharged misconduct evidence only to prove the identity of the person who committed the crimes.[11]

In accordance with this suggestion, the trial court instructed the jury, pursuant to CALJIC No. 2.50, that evidence of defendant's uncharged misconduct could be considered "only for the limited purpose of determining if it tends to show: [¶] the identity of the person who committed the crime, if any, of which the defendant is accused." The court also instructed the jury, pursuant to CALJIC No. 2.50.1, that "such other crime or crimes purportedly committed by a defendant must be proved by a preponderance of the evidence. You must not consider such evidence for any purpose unless you are satisfied that the particular defendant committed such other crime or crimes. [¶] The prosecution has the burden of proving these facts by a preponderance of the evidence." Finally, pursuant to CALJIC No. 2.50.2, the court defined "preponderance of the evidence."

Defendant now complains these instructions were flawed because they "failed to convey the jury's need to find Mr. Virgil's guilt for the uncharged crimes beyond a reasonable doubt before those crimes could be used as an

---

on either side of an issue preponderates, your finding on that issue must be against the party who had the burden of proving it. You should consider all the evidence bearing upon every issue regardless of who produced it." (CALJIC No. 2.50.2.)

[11] We note that, in order to prove identity by reliance on other crimes, the similarities between the charged and uncharged offenses must be so unusual and distinctive as to be like a signature. (*People v. Ewoldt* (1994) 7 Cal.4th 380, 403.) Defendant does not argue here that the offenses were insufficiently similar. Indeed, the defense had its own tactical reasons for permitting the admission of the uncharged crimes. Accordingly, we do not address this consideration further.

inference in establishing his identity as the perpetrator of the charged offenses . . . ." The premise of defendant's claim fails because "we have long held that 'during the guilt trial evidence of other crimes may be proved by a preponderance of the evidence . . . .' [Citations.] The 'beyond a reasonable doubt' standard is applicable only to evidence of 'other crimes' sought to be admitted as aggravating evidence at the penalty phase of trial. [Citation.]" (*People v. Medina* (1995) 11 Cal.4th 694, 763, italics omitted; see also *People v. Carpenter*, *supra*, 15 Cal.4th at p. 382 [concluding the "preponderance of the evidence standard adequately protects defendants"].)

Despite our long adherence to this rule, defendant urges us to reconsider the standard of proof set forth in the uncharged conduct instructions because, he asserts, this court "has not adequately addressed the conflict between the circumstantial evidence instruction [CALJIC No. 2.01]," which requires proof beyond a reasonable doubt of each essential fact in the chain of circumstances necessary to establish guilt, and CALJIC No. 2.50, which permits consideration of uncharged crimes if they are proven by only a preponderance of the evidence. We have explained before, however, that these different standards of proof are reconciled by the different purposes for which the evidence is used. When evidence of uncharged misconduct is admitted for the purpose of establishing identity or intent, we have explained that the crimes are mere "evidentiary facts." (*People v. Medina*, *supra*, 11 Cal.4th at p. 763.) The jury cannot consider them at all unless they find them proven by a preponderance of the evidence. "If the jury finds by a preponderance of the evidence that defendant committed the other crimes, the evidence is clearly relevant and may therefore be considered. (Evid. Code, § 351; see *Huddleston v. United States* [(1988)] 485 U.S. [681,] 689.)" (*People v. Carpenter*, *supra*, 15 Cal.4th at p. 382.) If the jury finds the facts sufficiently proven for consideration, it must still decide whether the facts are sufficient, taken with all the other evidence, to prove the defendant's guilt beyond a reasonable doubt. (*People v. Medina*, at p. 763; see also *People v. Foster* (2010)

46

50 Cal.4th 1301, 1347-1348 [no danger jury would use preponderance of evidence standard to decide elemental facts or issues because instructions on the People's burden and on circumstantial evidence make clear that ultimate facts must be proved beyond a reasonable doubt.])

### 2. *CALJIC No. 2.51*

Although he raised no objection below, defendant now complains the court prejudicially erred in giving CALJIC No. 2.51. He contends this instruction, combined with the prosecutor's closing argument, withdrew from the jury's consideration an essential element of the crime of robbery and the robbery special circumstance allegation. Defendant's failure to object to the instruction below, or the prosecutor's argument, forfeits the claim on appeal. (*People v. Hillhouse* (2002) 27 Cal.4th 469, 504; *People v. Prieto* (2003) 30 Cal.4th 226, 259-260.) The claim also fails on the merits.

CALJIC No. 2.51 advises that "[m]otive is not an element of the crime charged and need not be shown."[12] We have upheld this instruction as a proper statement of the law. "Motive describes the reason a person chooses to commit a crime. The reason, however, is different from a required mental state such as intent or malice." (*People v. Hillhouse*, *supra*, 27 Cal.4th at p. 504; see also *People v. Cash*, *supra*, 28 Cal.4th at p. 738.)

Defendant contends the prosecutor's closing argument conflated motive with specific intent. Based on this argument, defendant asserts, jurors could have misunderstood CALJIC No. 2.51 to mean that they did not have to find intent in order to convict him of robbery or the robbery special circumstance allegation. Having reviewed the prosecutor's argument, we are satisfied that no reasonable

---

[12]    The complete version of CALJIC No. 2.51 given to defendant's jury states: "Motive is not an element of the crime charged and need not be shown. However, you may consider motive or lack of motive as a circumstance in this case. Presence of motive may tend to establish guilt. Absence of motive may tend to establish innocence. You will therefore give its presence or absence as the case may be the weight to which you find it to be entitled."

47

juror would have confused "motive" with "intent" in the manner defendant envisions. The prosecutor discussed the definition of robbery and explained all the required elements in detail, including the requirement that defendant acted with the specific intent to permanently deprive the owners of their property. Although the prosecutor later explained that the special circumstance of murder committed in the course of a robbery meant, essentially, "that the compelling motive [for the murder] in this case was robbery," this discussion was distinct from his explanation of the required elements for robbery. The prosecutor could properly argue that defendant's motive in murdering Lao was to complete a robbery, but nothing in this argument suggested that the jury could convict defendant of robbery or robbery-murder without finding he had a specific intent to steal. By merely discussing motive, which was relevant to the robbery charges and the robbery-murder special circumstance allegation, the prosecutor did not conflate it with intent.

Moreover, considered as a whole, the instructions made clear that the jury had to find specific intent in order to convict defendant of robbery or find the robbery-murder allegation true. (CALJIC Nos. 3.31 [concurrence of act and specific intent]; 8.21 [first degree felony murder]; 8.83.1 [special circumstances—sufficiency of circumstantial evidence to prove required mental state]; 9.40 [robbery].) In addition to the pattern instructions, the jury was also given two special instructions on specific intent requested by the defense. The first stated, in part: "To convict the defendant of felony murder in the commission of a robbery you must find that he had the intent to steal at or before the time of the application of the lethal force." The second special instruction stated, in part: "To convict the defendant of robbery you must find that he had the specific intent to steal at or before the time of the application of force or violence, or the use of fear or intimidation." Considering these instructions, it is not reasonably likely the jury would have believed "motive" to be synonymous with "intent," or relied on

48

CALJIC No. 2.51 to convict defendant of the robbery-related charges without finding the requisite mens rea. (See *People v. Cash*, *supra*, 28 Cal.4th at p. 739.)

### 3. *Failure to Give CALJIC No. 2.22*

The court below did not give CALJIC No. 2.22, regarding how jurors are to weigh conflicting testimony.[13] Defendant now claims the absence of this instruction violated his rights under the state and federal Constitutions to due process, a fair and impartial jury, and a reliable penalty determination.

Although instruction with CALJIC No. 2.22 was not requested, we have held that the trial court is required to give it sua sponte when conflicting evidence has been presented. (*People v. Cleveland* (2004) 32 Cal.4th 704, 751; *People v. Rincon-Pineda* (1975) 14 Cal.3d 864, 884-885.) Defendant presented no evidence in the guilt phase; however, the jury heard conflicting testimony from various prosecution witnesses about the appearance and identity of Lao's murderer. Accordingly, as the Attorney General concedes, CALJIC No. 2.22 should have been given. Under the circumstances of this case, however, the absence of this instruction was harmless.

The same argument was made in *People v. Snead* (1993) 20 Cal.App.4th 1088, 1097, disapproved on another ground in *People v. Letner and Tobin* (2010) 50 Cal.4th 99, 181-182. In that case, the Court of Appeal concluded the failure to give CALJIC No. 2.22 was harmless error because the jury had received sufficient guidance from other standard instructions. (*Snead*, at p. 1097.) Here, defendant's jury received the same instructions the jury received in *Snead*: CALJIC No. 2.00,

---

**13** CALJIC No. 2.22 states: "You are not required to decide any issue of fact in accordance with the testimony of a number of witnesses, which does not convince you, as against the testimony of a lesser number or other evidence, which you find more convincing. You may not disregard the testimony of the greater number of witnesses merely from caprice, whim or prejudice, or from a desire to favor one side against the other. You must not decide an issue by the simple process of counting the number of witnesses [who have testified on the opposing sides]. The final test is not in the [relative] number of witnesses, but in the convincing force of the evidence."

"Direct and Circumstantial Evidence — Inferences"; CALJIC No. 2.20, "Credibility of Witness"; CALJIC No. 2.21.1, "Discrepancies in Testimony"; CALJIC No. 2.21.2, "Witness Willfully False"; CALJIC No. 2.27, "Sufficiency of Testimony of One Witness"; and CALJIC No. 2.80, "Expert Testimony." (*Snead*, at p. 1097.) Defendant's jury was also instructed with CALJIC No. 2.01, "Sufficiency of Circumstantial Evidence — Generally"; CALJIC No. 2.11, "Production of All Available Evidence Not Required"; CALJIC No. 2.13, "Prior Consistent or Inconsistent Statements as Evidence"; CALJIC No. 2.81, "Opinion Testimony of Lay Witness"; CALJIC No. 2.83, "Resolution of Conflicting Expert Testimony"; CALJIC No. 2.91, "Burden of Proving Identity Based Solely on Eyewitnesses"; and CALJIC No. 2.92, "Factors to Consider in Proving Identity by Eyewitness Testimony." Considering the instructions as a whole, we are satisfied the jury received ample guidance on how to evaluate conflicting testimony. (See *People v. Castillo* (1997) 16 Cal.4th 1009, 1016.) The prosecutor did not suggest that the jury should decide defendant's guilt by comparing the number of witnesses presented by each side, and there is no evidence the absence of CALJIC No. 2.22 hampered the jury's ability to evaluate the evidence. Because it is not reasonably probable that the jury would have reached a different result had CALJIC No. 2.22 been given, the court's error in failing to give the instruction was harmless. (*People v. Watson* (1956) 46 Cal.2d 818, 836.)

## H. *Sufficiency of Evidence*

Defendant claims no substantial evidence supports his convictions for the robbery and murder of Soy Sung Lao, particularly with regard to his identity as the perpetrator of these crimes. He also urges that insufficient evidence establishes he formed an intent to commit robbery before or at the time of the murder.

"A reviewing court faced with such a claim determines 'whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.' (*Jackson v. Virginia* (1979) 443 U.S. 307, 319, italics omitted;

see also *People v. Kraft* (2000) 23 Cal.4th 978, 1053.) We examine the record to determine 'whether it shows evidence that is reasonable, credible and of solid value from which a rational trier of fact could find the defendant guilty beyond a reasonable doubt.' [Citation.] Further, 'the appellate court presumes in support of the judgment the existence of every fact the trier could reasonably deduce from the evidence.' [Citation.] This standard applies whether direct or circumstantial evidence is involved. 'Although it is the jury's duty to acquit a defendant if it finds the circumstantial evidence susceptible of two reasonable interpretations, one of which suggests guilt and the other innocence, it is the jury, not the appellate court that must be convinced of the defendant's guilt beyond a reasonable doubt. [Citation.] " 'If the circumstances reasonably justify the trier of fact's findings, the opinion of the reviewing court that the circumstances might also reasonably be reconciled with a contrary finding does not warrant a reversal of the judgment.' " ' [Citation.]" (*People v. Catlin* (2001) 26 Cal.4th 81, 139.)

Substantial direct and circumstantial evidence established both that defendant was the person who murdered Lao and that he did so during the course of a robbery or attempted robbery. (See *People v. Marshall* (1997) 15 Cal.4th 1, 34, 40-41.) Sergeant Tiller and Lavette Gilmore saw defendant in the doughnut shop shortly before the murder. Gilmore thought defendant was behaving suspiciously because he would not look at her. Deandre Harrison and Debra Tomiyasu saw defendant emerge from the back of the store closely followed by Lao, who was screaming and bleeding profusely from many stab wounds. No one else was in the store. As Harrison and Tomiyasu watched, defendant walked straight to the cash register, took the money inside, and quickly left the store. Ella Ford saw defendant running across the parking lot, while someone behind him yelled, "he stabbed her." Defendant was carrying some object close to his body. Although defendant criticizes inconsistencies in these accounts, the jury clearly found the eyewitness testimony credible. We defer to this assessment. (*People v. Ochoa* (1993) 6 Cal.4th 1199, 1206.)

51

Defendant asserts that the prosecution presented no evidence that he formed an intent to steal the money in the register before or during the stabbing, and therefore the jury's true finding on the robbery-murder special circumstance allegation was based on mere speculation or conjecture. We disagree. The jury could have inferred that defendant planned to rob the doughnut shop from evidence that he waited at a back table, concealing his face from Gilmore, until the store was empty of other patrons. The cash register was already partially open when defendant emerged from the back of the store, walked straight to it, and took the cash inside. From these facts, the jury could infer that defendant planned to rob the store and the stabbing occurred after a robbery had been initiated. " '[W]hen one kills another and takes substantial property from the victim, it is ordinarily reasonable to presume the killing was for purposes of robbery.' [Citations.]" (*People v. Horning* (2004) 34 Cal.4th 871, 903.) The jury also heard evidence that defendant had committed several other property crimes in the immediate area, including the robberies of Beatriz Addo and of Samuel Draper, during which he threatened to harm the victims with a sharp object. The jury was instructed that it could use evidence of these other crimes to prove intent. (See Evid. Code, § 1101, subd. (b).) Moreover, there was no evidence "suggesting, or requiring the jury to conclude, that defendant took . . . property merely to obtain a reminder or token of the incident [citation], to give a false impression about his actual motive for the murder, or in some other way to facilitate or conceal the killing [citation]. Nor was there substantial evidence of any motive for the murder apart from accomplishing the robbery." (*People v. Bolden* (2002) 29 Cal.4th 515, 554.) The jury could reasonably conclude from the evidence that defendant killed Lao primarily and perhaps solely to facilitate the robbery.

**I.** *Certification of Appellate Record*

Defendant raises two claims of error concerning the trial court's certification of the record on appeal. First, he claims the court erred in denying his request to settle the record with respect to a chalkboard diagram created by a blood

spatter expert during her testimony. Second, he claims the court erred in including in the settled statement the trial court's own recollection of the circumstances surrounding the hardship excusal of 60 prospective jurors. Defendant argues these errors deprived him of a complete and accurate record on appeal. The record settling procedures were adequate and did not violate defendant's constitutional rights.

"The record on appeal in a capital case 'includes, but is not limited to, the following: [¶] (1) The normal and additional record prescribed in the rules adopted by the Judicial Council pertaining to an appeal taken by the defendant from a judgment of conviction. [¶] (2) A copy of any other paper or record on file or lodged with the superior or municipal court and a transcript of any other oral proceeding reported in the superior or municipal court pertaining to the trial of the cause.' (Pen. Code, § 190.7, subd. (a)(1), (2).) 'In any case in which a death sentence may be imposed, all proceedings conducted in the municipal and superior courts, including all conferences and proceedings, whether in open court, in conference in the courtroom, or in chambers, shall be conducted on the record with a court reporter present.' (*Id*., § 190.9, subd. (a)(1).)" (*Marks v. Superior Court* (2002) 27 Cal.4th 176, 192.) When gaps occur in the record, rule 8.137 (former rule 7) of the California Rules of Court provides a mechanism for creating a settled statement. (*Marks*, at p. 192; see also Cal. Rules of Court, rules 8.346 [providing for the use of settled statement procedures in criminal appeals] & 8.619(d)(3) [providing for the use of settled statements in capital cases].)

### 1. *Chalkboard Diagram*

On September 26, 2002, defendant's appellate counsel filed a request to augment, correct, and settle the record on appeal. Among several other items, defendant asked for a settlement of the chalkboard diagram created by Los Angeles Sheriff's Department Senior Criminalist Elizabeth Devine. During her direct examination, Devine was asked how a criminalist can determine from its appearance the direction a blood droplet has traveled. She requested and was

53

provided with a chalkboard, which she used to illustrate her testimony about the effect of gravity on blood droplets. Because the diagram was drawn on a blackboard and was not admitted into evidence, it would have to be re-created by the witness for the record to be settled. The prosecutor recalled only that the diagram consisted of "basic marks . . . to indicate blood spatter in a directional way." He suggested that defendant's appellate counsel consult with Devine because the drawing might have been "a standard demonstration that she does in these kinds of cases." Defendant's appellate counsel was not able to contact Devine. However, Devine's former supervisor expressed the belief that Devine would not have created her chalkboard diagram spontaneously in court, but would have based it on materials that were likely preserved in her case file.

The Attorney General opposed appellate counsel's request to settle the record with a re-creation of Senior Criminalist Devine's chalkboard diagram. At a hearing on November 18, 2002, the trial court also expressed concern about allowing defendant's attorney to try to re-create the diagram from information in Devine's files because the files likely contained information not presented to the jury. Counsel was merely guessing that Devine had in fact re-created something in her file, and the court itself had no memory of the diagram. When counsel persisted in seeking a court order for access to Devine's files, the court refused, explaining the search would be futile: "We are not talking about something that the jury was actually given in hand. It was something drawn, they saw whatever was drawn on the board." Accordingly, defendant's request to settle the record on this point was denied.

The trial court did not err in refusing to authorize defendant's appellate counsel to search an expert's files in hopes of finding a document resembling a diagram the expert drew on a chalkboard to illustrate and explain her testimony. No attempt was made to preserve the chalk drawing, which was by its nature ephemeral. It was not marked, lodged, or admitted into evidence, nor was a photograph taken to preserve it. Neither the attorneys nor the trial court could

54

recall exactly what the diagram looked like. Assuming record settlement procedures can be used for demonstrative evidence, the diagram was not a proper subject for settlement of the record.[14]

"The rules authorizing settlement, augmentation, and correction of the record on appeal concern documents 'file[d] or lodged' in the superior court and transcripts of 'oral proceedings' that occurred therein. [Citations.] These provisions—much like the entire network of rules governing matter properly included in the appellate record—are intended to ensure that the record transmitted to the reviewing court preserves and conforms to the proceedings actually undertaken in the trial court. [Citations.] The settlement, augmentation, and correction process does not allow parties to create proceedings, make records, or litigate issues which they neglected to pursue earlier." (*People v. Tuilaepa* (1992) 4 Cal.4th 569, 585.) Defendant's trial counsel took no steps to preserve the diagram Senior Criminalist Devine spontaneously drew during her testimony. The settlement process does not permit defendant to create anew something that he neglected to make part of the record in the first place. The trial court therefore did not abuse its discretion in denying appellate counsel's request to search for a similar diagram in the expert's files.

### 2. *Record of Hardship Excusals*

In an addendum to his original request to settle the record, defendant's appellate counsel also asked the court to clarify whether the discussion of jurors' hardship requests was reported or whether the record needed to be settled regarding the excusals. In his first proposed settlement of the record, defendant noted that after prospective jurors completed hardship questionnaires, the trial court read the names of jurors whose hardship requests had been granted and those

---

**14** We note that the Rules of Court refer to preparation of a settled statement when "oral proceedings cannot be transcribed." (Cal. Rules of Court, rule 8.346(a).) We assume but do not hold that the settled statement procedures can be used in the case of demonstrative evidence.

of jurors from whom more information was sought.  Except for jurors who were questioned about their requests, the record included no discussion about 61 jurors who were excused for hardship based on their questionnaires alone, and the prosecutor did not recall how the court handled these hardship excusals.  In order to settle the record, defendant's appellate counsel requested the trial court's "assistance in detailing the procedures employed and the reasons for excusing the prospective jurors at issue."

At the November 18, 2002 hearing, defendant's appellate counsel asked for the court's input regarding the hardship excusal of 61 jurors.  Trial counsel had told him he believed a hearing had been conducted on the record before these jurors were excused.  The trial court stated, "I do have a recollection; and as far as the original hardships were concerned, both counsel stipulated that certain jurors could be excused; and it was done on the basis of their paid jury leave."  Although the court was reluctant to attempt to recreate a record when neither side had objected to excusing the jurors, it agreed with appellate counsel's proposal to have both trial counsel review the 61 hardship questionnaires and try to recollect the reasons for their release.

In his second revised proposed settled statement, appellate counsel reported that, although the prosecutor did not recall any details about the hardship excusals, defendant's trial counsel "recalled that the Court was 'pretty liberal' in ruling on the hardship requests and the Court's primary concerns were whether (1) the prospective juror would be compensated adequately for jury service, (2) whether anyone was ill in the juror's family, or (3) whether the juror was a primary caretaker for another person."  Defendant's trial counsel also believed a hearing had been held with a court reporter on the hardship requests.

At the next court hearing, the trial court added its recollection "that each counsel did, indeed, see the questionnaires and . . . stipulated or agreed that these jurors would be excused . . . because they couldn't be away from work that long." The court recalled that the financial hardship of serving on a long jury trial "was

56

the only aspect" of hardship discussed with the 60 prospective jurors who were excused at the outset of jury selection. The court agreed to settle the record on this point as set forth in defendant's proposed statement. Defendant's appellate counsel reminded the court of his request for the court reporter to review her notes to look for any reported proceedings concerning the excused jurors. The court responded that the matter had been reviewed and the court reporter had "reported everything that was done before her."

Defendant now objects that the court exceeded its authority in settling the record when it reported that both counsel had stipulated to the hardship excusals. Defendant complains the court usurped the role of the parties in stating its own recollection about the procedure. We disagree. Although the trial court's duty is " 'to settle a proposed statement, not to make one' " (*Marks v. Superior Court*, *supra*, 27 Cal.4th at p. 195, quoting *Stevens v. Superior Court* (1958) 160 Cal.App.2d 264, 269), we have observed that record settlement is to be based on " 'all available aids, *including the judge's own memory . . . .*" (*Marks*, at p. 196, quoting *People v. Gzibowski* (1982) 32 Cal.3d 580, 585, fn. 2, italics added.) In this case, neither trial attorney could remember specific reasons why the 60 prospective jurors were excused for hardship, and defendant's appellate counsel specifically asked the trial court to explain what had happened. Defendant's first proposed settled statement expressly sought "the Court's assistance in detailing the procedures employed and the reasons for excusing the prospective jurors at issue." At the November 18, 2002 hearing, defendant's appellate counsel asked again for the court's recollection about the hardship dismissals, and the court responded that both counsel had stipulated to them. The court did not exceed its authority by describing its memory of the proceedings, at the specific request of counsel, to aid counsel in preparing a settled statement. (See *Marks*, at p. 196.) To the extent there was any error, it was invited by defendant's repeated requests for the court's input. (*People v. Williams* (2008) 43 Cal.4th 584, 629.) Furthermore, because defendant has presented nothing to suggest the court's recollection is untrue, any

57

error was harmless. (See *People v. Young* (2005) 34 Cal.4th 1149, 1170 [defendant's burden to demonstrate prejudice].)

Defendant also challenges the court's representation that all reported proceedings regarding hardship excusals had been transcribed. Defendant asked the court to contact the court reporter about a possible missing transcript on December 12, 2002, and the court stated at the December 16, 2002 hearing that the reporter had been contacted and had verified her transcriptions were complete. Because only three days had elapsed between his request and the court's representation at the hearing, defendant speculates that the court had not, in fact, contacted the reporter, but was instead basing its representation on a discussion with the court's capital appeals coordinator. Defendant did not make this serious accusation below, and thus the trial court had no opportunity to respond to it. We will not conclude the trial court was disingenuous based on sheer surmise and at this late date, when defendant's appellate counsel could have established the source of the court's information by asking a simple question at the December 16 hearing. Defendant's trial counsel "believed" a hearing had been conducted, with a reporter, for hardship requests, but this memory could have applied to the second round of hardship dismissals, during which jurors who were not excused in the initial cut were questioned in greater detail about their reasons for seeking to be released from service. These proceedings were transcribed and are included in the record on appeal.

## II.    Penalty Phase Issues

### A.    *Stun Belt*

The trial court ordered defendant to wear an electronic security belt during the penalty phase of trial after he was caught hiding a staple in his mouth while being transported to court. Defendant argues the imposition of this restraint violated his rights under the state and federal Constitutions and requires reversal of the penalty judgment. We conclude the order was an appropriate exercise of the court's discretion.

On the morning of March 9, 1995, defendant was being held with two other "K-10" inmates[15] in a small waiting room away from the main lockup area. All three had waist chains with their hands shackled to their sides to prevent a full range of arm movement away from the body. As she looked into the room from the hallway, Deputy Sheriff Dianna Norris saw defendant's hands "playing with" another inmate's handcuffs. The two were facing each other, and defendant's hand moved like he was turning a key. When he saw the deputy, defendant dropped his hands and backed up to the wall. Deputy Norris noticed a short gray object in his hand. Defendant said he had nothing in his hand, but the deputy saw him slip a silver object into his mouth. When she asked what he had put in his mouth, defendant replied, "nothing" and stuck out his tongue. As he walked toward the door, however, Deputy Norris saw defendant lean to the side and spit. She went back into the room and retrieved the object, which was a 1.25-inch-long, heavy-duty staple.

Deputy Norris and Deputy Sheriff Thomas Harvey testified that the handcuffs these inmates were wearing have been successfully "picked" with foreign objects several times in the past, and the deputies had seen similar makeshift keys taken from other inmates. It is easier to pick handcuffs worn by someone else, rather than your own. Normally, the inmates would have spent 20 to 30 minutes alone in the waiting room, and Deputy Norris would have taken each one to court separately, using a private elevator. Norris transported the inmates without other deputies present, and she admitted she did not always check to make sure their handcuffs were locked.

Before the hearing on this incident, the trial court discussed the possibility of imposing a heightened security measure such as shackling, increased bailiff personnel, or an electronic stun belt. When defense counsel expressed concern

---

[15] "K-10" referred to inmates who required "special handling" because they were dangerous, needed protection, or needed to be separated from the group for some other reason.

about the potential prejudice from visible shackles, the court observed that the stun belt might be the least intrusive measure available. A bailiff explained how the device worked, and a belt was brought into the courtroom for the attorneys to examine. After the hearing, defense counsel did not disagree that a heightened security measure would be justified, but he urged the court to use either increased courtroom bailiffs or leg shackles, rather than the stun belt.

The trial court found that defendant's attempt to help another inmate escape, and thereby escape himself, warranted additional security measures. Because it concluded leg shackles would more likely be visible to the jury than a belt worn under the clothing,[16] the court ordered defendant to wear the stun belt. Defendant now argues the need for increased security was not sufficiently demonstrated and the stun belt was not the least restrictive means of providing that security. We conclude the order was well within the court's discretion.

The "court has broad power to maintain courtroom security and orderly proceedings." (*People v. Hayes* (1999) 21 Cal.4th 1211, 1269.) On appeal, its decisions on these matters are reviewed for abuse of discretion. (*People v. Stevens* (2009) 47 Cal.4th 625, 633.) Under California law, "a defendant cannot be subjected to physical restraints of any kind in the courtroom while in the jury's presence, unless there is a showing of a manifest need for such restraints." (*People v. Duran* (1976) 16 Cal.3d 282, 290-291.) Similarly, the federal "Constitution forbids the use of visible shackles . . . unless that use is 'justified by an essential state interest' — such as the interest in courtroom security — specific to the defendant on trial." (*Deck v. Missouri* (2005) 544 U.S. 622, 624, italics omitted.) These principles also apply to the use of an electronic "stun belt," even if the device is not visible to the jury. (*People v. Mar* (2002) 28 Cal.4th 1201, 1219.) "In deciding whether restraints are justified, the trial court may 'take into

---

[16] Defendant was dressed in jail-issued clothing during the penalty phase. He refused to wear civilian clothing despite his attorney's strong advice that he do so.

account the factors that courts have traditionally relied on in gauging potential security problems and the risk of escape at trial.' (*Deck v. Missouri*, at p. 629.) These factors include evidence establishing that a defendant poses a safety risk, a flight risk, or is likely to disrupt the proceedings or otherwise engage in nonconforming behavior." (*People v. Gamache* (2010) 48 Cal.4th 347, 367.) Although the court need not hold a formal hearing before imposing restraints, "the record must show the court based its determination on facts, not rumor and innuendo." (*People v. Stevens*, at p. 633.)

The testimony of Deputy Norris and Deputy Harvey established that defendant was a genuine escape risk. He was seen using a makeshift key to unlock another inmate's handcuffs. Defendant lied to Deputy Norris and then tried to hide and dispose of the "key." It was reasonable for the court to conclude from this evidence that defendant had been caught attempting to help another inmate escape, and possibly attempting to escape himself. This conduct was sufficient to warrant increased security. (See, e.g., *People v. Gamache*, *supra*, 48 Cal.4th at pp. 369-370 [defendant found with a homemade handcuff key was a flight risk]; *People v. Stankewitz* (1990) 51 Cal.3d 72, 95-97 [defendant who attempted to escape from holding cell and engaged in violent conduct was properly restrained].)

Defendant also complains that the court failed to consider the potential physical harm and psychological impact of the stun belt when it rejected alternative security measures. Generally, when physical restraints are called for, a trial court should impose "the least obtrusive or restrictive restraint" that will ensure effective security. (*People v. Mar*, *supra*, 28 Cal.4th at p. 1226.) The trial court found that the stun belt was the least intrusive security measure available. The device was brought into court for examination, and a bailiff explained in detail the way it worked, the physical effects of its activation, and the protocol for treating someone who had been shocked. Courtroom deputies had developed written guidelines, which counsel were given an opportunity to study, for when the

61

belt could be activated.  The court explained that the deputies were bound to stay within these guidelines and could be trusted to do so.

In *People v. Mar*, *supra*, 28 Cal.4th at pages 1225-1230, we examined the potential psychological consequences of wearing a stun belt and the physical effects from electric shock in subjects with certain medical conditions.  Because our decision was the first to consider use of an electronic stun belt in California criminal trials, however, we expressly stated that our discussion was offered to provide guidance "in *future* trials."  (*Id.* at p. 1225, italics added; see also *id*. at p. 1230.)  Defendant's trial occurred seven years before our decision in *Mar*.  The trial court was not required to foresee and discuss each of the concerns detailed in that opinion.  (*People v. Lomax* (2010) 49 Cal.4th 530, 562; *People v. Gamache*, *supra*, 48 Cal.4th at p. 367, fn. 7.)  Moreover, because defendant did not testify, some of the concerns about psychological impacts discussed in *Mar* are inapplicable.

## B. *Exclusion of Defense Exhibits*

Defendant complains the exclusion and modification of certain defense exhibits deprived him of his constitutional right to have the jury consider all relevant mitigating evidence offered in the penalty phase of a capital trial.  We find no error.

On direct examination, defense counsel showed Annie Antoine several baby pictures of Nigel, the child she had with defendant.  Antoine had sent defendant these photographs when he was in jail.  After Antoine's testimony, defense counsel sought to admit the photographs into evidence.  The prosecutor objected that the photos were cumulative and of questionable relevance because "[w]e know [defendant] has a child.  We've seen him in court."  He also objected to the writing Antoine had placed on the back of all of the pictures.  Defense counsel responded that the purpose of the writing was to show defendant and Antoine had communicated about the child, and he argued it would be unfair to exclude the photos after the prosecution had been allowed to display photos of the

62

victims.  The court agreed to admit some photographs but not "all nine of them," and it expressed concern about the messages written on them.  After further discussion, defense counsel chose five photos, and these were admitted into evidence.  Defense counsel agreed to "opaque[] out" the writing on some of the exhibits but asked that the messages on others remain visible.  One photograph, which showed a diapered baby taking a step, was altered to cover up the message written on the back, " 'Check me out.  I'm walking around.' "  Messages on the other four photographs were left intact.[17]

"The Eighth and Fourteenth Amendments require that the sentencer in a capital case not be precluded from considering any relevant mitigating evidence, that is, evidence regarding 'any aspect of a defendant's character or record and any of the circumstances of the offense that the defendant proffers as a basis for a sentence less than death.'  [Citations.]  The constitutional mandate contemplates the introduction of a broad range of evidence mitigating imposition of the death penalty.  [Citations.]  . . .  [¶]  At the same time, however, the United States Supreme Court has made clear that the trial court retains the authority to exclude, as irrelevant, evidence that has no bearing on the defendant's character, prior record or the circumstances of the offense.  [Citations.]" (*People v. Frye*, *supra*, 18 Cal.4th at p. 1015; see also *Skipper v. South Carolina* (1986) 476 U.S. 1, 4-5; *Lockett v. Ohio* (1978) 438 U.S. 586, 604 & fn. 12.)

Defendant complains all of the photographs should have been admitted to show that he and Antoine "were in regular and ongoing contact about Nigel," but the photographs themselves do not demonstrate that any contact occurred over an

---

**17**      On the back of one photograph of Antoine and young Nigel was the message:  "The <u>loves</u> of your life, Wayne!  Annie Antoine-Virgil & your son Nigel Phillip Antoine.  About to go shopping & to the park."  Antoine wrote on the back of another photo of the two of them, "To: Wayne, From: Your family, Ann & Nigel.  We love you!"  Also admitted were baby photographs of Nigel with his age written on the back.  One showing the baby at six months old included a comment on the child's expression.

extended period of time. Although the pictures show Nigel at different ages, nothing in the record suggests Antoine sent them to defendant at different times. Antoine simply testified that she sent defendant the photos after she learned he was in prison.

Evidence that defendant is loved by family members or others is admissible to show his good character. (See *People v. Ochoa*, *supra*, 19 Cal.4th at p. 456.) We need not decide here whether photos of defendant's child with notations written by someone else were admissible to prove this point. The trial court, in exercising its discretion, allowed their admission. By reducing the number of photographs from nine to five, the trial court did not violate defendant's constitutional rights to present relevant mitigating evidence to the jury. Evidence Code section 352 permits the court to exclude mitigating evidence offered by the defendant if it is cumulative. (*People v. Brown* (2003) 31 Cal.4th 518, 576.) Although capital defendants have a constitutional right to present relevant mitigating evidence to the jury, "the United States Supreme Court never has suggested that this right precludes the state from applying ordinary rules of evidence to determine whether such evidence is admissible." (*People v. Smithey* (1999) 20 Cal.4th 936, 995.) It was within the trial court's discretion to limit the number of photographs.

Nor did the trial court abuse its discretion in modifying one of the photographs to remove a comment intended to represent a statement by the infant Nigel. "[R]elevance as it pertains to mitigation evidence is no different from the definition of relevance as the term is understood generally. [Citation.] ' "Relevant mitigating evidence is evidence which tends logically to prove or disprove some fact or circumstance which a fact-finder could reasonably deem to have mitigating value. . . ." ' [Citations.]" (*People v. Frye*, *supra*, 18 Cal.4th at p. 1016.) The comment attributed to the child was not relevant to any issue in the penalty phase of trial, and the court did not err in excluding it.

### C. *Victim Impact Evidence*

#### 1. *Murder Victim's Life History*

Defendant contends the court infringed his constitutional rights by admitting evidence about details of Lao's life and allowing the prosecutor to argue that defendant's life was comparatively unworthy of sympathy.

At the start of the penalty phase, defense counsel objected to victim impact testimony about Lao's childhood flight from Cambodia, her education in America, and other details that would "paint a live history of the victim." He argued that under *Payne v. Tennessee* (1991) 501 U.S. 808 and *People v. Edwards* (1991) 54 Cal.3d 787, only evidence about the direct impact of the murder on the victim's family was relevant and admissible in a capital trial. Counsel especially sought to avoid a prosecution argument that Lao had escaped the "killing fields" of Cambodia only to be murdered "in the killing fields of Gardena." The trial court disagreed that Lao's life history was entirely irrelevant, reasoning that it was important for the jury to have information about the victim's life to fully understand the impact of her loss on her family. The court also ruled that the evidence was not unfairly prejudicial.

Lao's sister, Lynn Ngov, was allowed to testify that the siblings left Cambodia to escape communism when Lao was 10 years old. They lived in San Diego and then Los Angeles, where Lao attended college. Lao was scheduled to graduate from the University of Southern California in May 1993. Ngov testified that Lao was very close to Ngov's two children, and she still felt shocked and upset about the murder.

In his closing argument, the prosecutor noted that Lao had fled from a place of political oppression and violence and had come to this country to improve her life. She came here without her parents, borrowed money to attend school, and was taking advantage of all the opportunities the United States had to offer. He concluded, "in this great land of opportunity, Soy Lao found her killing fields at the corner of El Segundo and Van Ness. [¶] And if Lester Virgil did something in

65

this case besides rob this young girl of her life and 12 dollars, he might just have done something wors[e]. He robbed her of her dreams." Defendant raised no objection to this argument.

In *Payne v. Tennessee*, *supra*, 501 U.S. at p. 825, the United States Supreme Court held that victim impact evidence is not inadmissible per se because it "is simply another form or method of informing the sentencing authority about the specific harm caused by the crime in question . . . ." We have held that evidence and argument about the specific harm caused by the defendant, including the impact on the family of the victim, is admissible as an aggravating circumstance under factor (a) of section 190.3. (*People v. Edwards*, *supra*, 54 Cal.3d at p. 835.) Of course, such evidence must conform to established limits on emotional evidence and argument. " '[T]he jury must face its obligation soberly and rationally, and should not be given the impression that emotion may reign over reason. [Citation.] In each case, therefore, the trial court must strike a careful balance between the probative and the prejudicial. [Citations.] On the one hand, it should allow evidence and argument on emotional though relevant subjects that could provide legitimate reasons to sway the jury to show mercy or to impose the ultimate sanction. On the other hand, irrelevant information or inflammatory rhetoric that diverts the jury's attention from its proper role or invites an irrational, purely subjective response should be curtailed.' [Citation.]" (*Id.* at p. 836.)

The limited testimony and argument presented about Lao's life history remained well within these limits on permissible victim impact evidence. We have recognized that the prosecution has some latitude in presenting evidence about the victim. " '[T]he State has a legitimate interest in counteracting the mitigating evidence which the defendant is entitled to put in, by reminding the sentencer that just as the murderer should be considered as an individual, so too the victim is an individual whose death represents a unique loss to society and in particular to his family.' " (*Payne v. Tennessee*, *supra*, 501 U.S. at p. 825, quoting

*Booth v. Maryland* (1987) 482 U.S. 496, 517 (dis. opn. by White, J.); see also *People v. Marks* (2003) 31 Cal.4th 197, 235.) Ngov's description of the siblings' flight from Cambodia and Lao's pursuit of educational goals in America was relevant to show her closeness to Lao and, by extension, how Lao's murder had affected the family. (See *People v. Boyette*, *supra*, 29 Cal.4th at pp. 444-445.) The testimony was not unduly emotional or inflammatory, and it was relatively brief. The prosecutor's argument also stayed within appropriate boundaries and did not encourage an irrational or emotional response unrelated to the facts of the case. Lao's background and aspirations were mentioned at the end of closing argument. The discussion was brief and was relevant to convey the full impact of defendant's crime on Lao's family and the community. (*Id*. at p. 444; *People v. Raley* (1992) 2 Cal.4th 870, 916.) The brief testimony and argument mentioning pertinent facts about Lao's life were not unduly prejudicial and did not violate defendant's constitutional rights.

### 2.       *Rodriguez's Victim Impact Testimony*

Defendant also argues the court erred in failing to limit victim impact evidence to the capital offense against Lao. He claims his state and federal constitutional rights were violated by admission of testimony concerning the effects of his assault on Benita Rodriguez.

Initially, we note that defense counsel's failure to object to the victim impact testimony from Rodriquez forfeits the claim on appeal. (*People v. Clark* (1990) 50 Cal.3d 583, 625-626; see *People v. Mendoza* (2000) 24 Cal.4th 130, 186.) In any event, we have repeatedly held that the admission of evidence about the impacts of a capital defendant's other violent criminal activity does not violate the state or federal Constitutions. (E.g., *People v. Price* (1991) 1 Cal.4th 324, 479; *People v. Clark*, at pp. 628-629; *People v. Karis*, *supra*, 46 Cal.3d at p. 641.) The circumstances of uncharged violent crimes, including the impact on victims of those crimes, are made expressly admissible by section 190.3, factor (b). (*People v. Bramit* (2009) 46 Cal.4th 1221, 1241.)

67

Defendant acknowledges our prior decisions but urges us to reconsider the issue based on opinions from other states. (*People v. Hope* (1998) 184 Ill.2d 39, 49-53 [702 N.E.2d 1282]; *Sherman v. State* (1998) 114 Nev. 998, 1012-1014 [965 P.2d 903, 914]; *State v. Nesbit* (Tenn. 1998) 978 S.W.2d 872, 891, fn. 11.) We recently considered these out-of-state cases and concluded they do not support a claim that the admission of victim impact evidence regarding prior crimes violates the federal Constitution. (*People v. Davis* (2009) 46 Cal.4th 539, 618.) Moreover, the cases upon which defendant relies "are not binding on this court, which has repeatedly held that the Eighth Amendment does not prohibit the admission of testimony by a defendant's prior victims concerning the impact of his violent crimes against them. [Citations.]" (*Ibid*.) Because defendant offers no compelling reason to depart from our settled views, we conclude the trial court did not err in admitting evidence about the effects of defendant's assault on Rodriguez.

### D. *Instructional Error Claims*

#### 1. *CALJIC No. 8.84.1*

At the conclusion of the penalty phase, the court gave CALJIC No. 8.84.1, which states, in pertinent part: "You are now being instructed as to all of the law that applies to the penalty phase of the trial. [¶] You must determine what the facts are from the evidence received during the entire trial unless you are instructed otherwise. You must accept and follow the law that I shall state to you. Disregard all other instructions given to you in other phases of this trial." The court also instructed the jury with CALJIC Nos. 8.85, listing factors for the jury's consideration in determining penalty, CALJIC Nos. 8.86 and 8.87, requiring proof beyond a reasonable doubt of a prior conviction or prior criminal activity offered in aggravation, and CALJIC No. 8.88, setting forth the concluding instructions for the penalty phase. Contrary to the recommendation in the Use Note to CALJIC No. 8.84.1, the court did not reinstruct the jury with applicable evidentiary instructions from CALJIC Nos. 1.00 through 3.31, including the instruction

defining "reasonable doubt" (CALJIC No. 2.90).  Defendant cites these omissions as error.

We have held that the failure to reinstruct on evidentiary principles at the penalty phase, combined with the reading of CALJIC No. 8.84.1, may constitute error.  (*People v. Lewis* (2008) 43 Cal.4th 415, 535; *People v. Carter* (2003) 30 Cal.4th 1166, 1220-1221.)  "[I]f a trial court instructs the jury at the penalty phase not to refer to instructions given at the guilt phase, it later must provide the jury with those instructions applicable to the evaluation of evidence at the penalty phase.  (*People v. Moon* [(2005)] 37 Cal.4th [1,] 37.)"  (*Lewis*, at p. 535.)  In addition, because the jury was instructed that defendant's prior criminal acts had to be proven beyond a reasonable doubt before they could be considered in aggravation, the court should have given CALJIC No. 2.90 defining "reasonable doubt."  (See *People v. Cowan* (2010) 50 Cal.4th 401, 489-490.)  However, the trial court's failure to reinstruct here was harmless because there is no reasonable possibility the error affected the verdict (*People v. Gonzalez* (2006) 38 Cal.4th 932, 960-961) and it was harmless beyond a reasonable doubt (*Chapman v. California* (1967) 386 U.S. 18).  (See *People v. Wilson* (2008) 43 Cal.4th 1, 28 [the state "reasonable possibility" test is essentially the same as the federal "beyond a reasonable doubt" test for harmless error].)

Defendant does not argue the jury might have been confused about how to consider penalty phase evidence by the absence of any particular evidentiary instruction.  Rather, he makes the more general claim that his penalty judgment must be reversed because the trial court failed to instruct the jury a second time on the presumption of innocence, the definition of reasonable doubt, and the prosecution's burden of proof.  We have repeatedly rejected the claim that the court must instruct on the presumption of innocence at the penalty phase of a capital trial.  (*People v. Prieto*, *supra*, 30 Cal.4th at p. 262; *People v. Benson* (1990) 52 Cal.3d 754, 810.)  Likewise, the absence of a penalty phase instruction on the reasonable doubt standard, or any standard of proof regarding aggravating

and mitigating evidence, does not violate a capital defendant's constitutional rights. (*People v. Samuels* (2005) 36 Cal.4th 96, 137; *People v. Vieira* (2005) 35 Cal.4th 264, 301.) " 'The federal Constitution does not require the jury to find beyond a reasonable doubt that the prosecution proved each aggravating factor, that the circumstances in aggravation outweigh those in mitigation, or that death is the appropriate penalty.' [Citation.] ' "Unlike the guilt determination, 'the sentencing function is inherently moral and normative, not factual' [citation] and, hence, not susceptible to a burden-of-proof quantification." ' [Citation.]" (*Vieira*, at p. 301.) We have also routinely rejected defendant's argument that the jury should have been instructed that the prosecution has the burden of persuasion to convince the jury that death was the appropriate penalty. (*Ibid.*; see also *People v. Panah* (2005) 35 Cal.4th 395, 498.) No such instruction was required because "the prosecution has no burden of proof that death is the appropriate penalty, or that one or more aggravating factors or crimes exist, in order to obtain a judgment of death. [Citations.]" (*People v. Anderson* (2001) 25 Cal.4th 543, 589.)

Defendant's arguments to the contrary notwithstanding, we have consistently found that these conclusions are not altered by the United States Supreme Court's decisions in *Apprendi v. New Jersey* (2000) 530 U.S. 466 (*Apprendi*), *Ring v. Arizona* (2002) 536 U.S. 584 (*Ring*), or *Blakely v. Washington* (2004) 542 U.S. 296 (*Blakely*). (*People v. Ward* (2005) 36 Cal.4th 186, 221; *People v. Samuels*, *supra*, 36 Cal.4th at p. 137; *People v. Morrison* (2004) 34 Cal.4th 698, 730-731; *People v. Prieto* , *supra*, 30 Cal.4th at pp. 262-263.) In his reply brief, defendant now urges us to reconsider these positions in light of the high court's more recent pronouncements in *Cunningham v. California* (2007) 549 U.S. 270 (*Cunningham*).

*Cunningham* held that any fact that increases the penalty for a crime beyond the relevant statutory maximum, which under California's determinate sentencing law is the middle term, must be submitted to the jury and found true beyond a reasonable doubt. (*Cunningham*, *supra*, 549 U.S. at pp. 288-289, 293.)

70

*Cunningham*'s holding has no bearing on penalty phase determinations in California for the same reasons that the principles announced in *Ring* and *Apprendi* do not apply: " '[U]nder the California death penalty scheme, once the defendant has been convicted of first degree murder and one or more special circumstances has been found true beyond a reasonable doubt, death *is* no more than the prescribed statutory maximum for the offense; the only alternative is life imprisonment without the possibility of parole.' (*People v. Anderson*[, *supra*,] 25 Cal.4th [at pp.] 589-590, fn. 14.) Thus, in the penalty phase, the jury merely weighs the factors enumerated in section 190.3 and determines 'whether a defendant eligible for the death penalty should in fact receive that sentence.' (*Tuilaepa v. California* (1994) 512 U.S. 967, 972.) No single factor therefore determines which penalty — death or life without the possibility of parole — is appropriate." (*People v. Prieto*, *supra*, 30 Cal.4th at p. 263.) Accordingly, the high court's decision in *Cunningham* has no apparent application to our state's capital sentencing scheme. (*People v. Prince* (2007) 40 Cal.4th 1179, 1297.)

## 2. *Refusal of Defense Special Instructions*

The trial court refused to give three special instructions requested by the defense. Defendant now claims this ruling violated various federal constitutional guarantees. We conclude the ruling was an appropriate exercise of the court's discretion.

Special Instruction No. 1 advised that the mitigating circumstances identified in CALJIC No. 8.85 were merely examples, that jurors could consider other mitigating facts related to the case or defendant, that any one mitigating factor could be sufficient to reject a death sentence, that mitigating factors need not be proven beyond a reasonable doubt, that mitigation could be based on "any evidence . . . no matter how weak," and that jurors could rely on "mercy, sympathy, and/or sentiment in deciding what weight to give each mitigating factor." Special Instruction No. 2 was entirely duplicative of Special Instruction No. 1. It stated that jurors could reject the death penalty based on compassion or

sympathy alone, that mitigating factors need not be proven beyond a reasonable doubt, and that mitigating factors could be found based on "any evidence . . . no matter how weak."

These proposed instructions were largely duplicative of CALJIC No. 8.85, which was given. CALJIC No. 8.85 is both a correct and an adequate explanation of how jurors should consider aggravating and mitigating factors. (*People v. Butler* (2009) 46 Cal.4th 847, 875.) Accordingly, the court has no obligation to "give pinpoint instructions regarding what mitigating evidence the jury may consider, or special instructions regarding mercy and compassion. [Citations.]" (*People v. Valencia* (2008) 43 Cal.4th 268, 309-310; see also *People v. Riggs* (2008) 44 Cal.4th 248, 328-329.) We have repeatedly held that instructions on the burden of proof are unnecessary in the penalty phase of a capital trial (*People v. Carpenter*, *supra*, 15 Cal.4th at pp. 417-418), and thus jurors need not be instructed that mitigating factors do not have to be proven beyond a reasonable doubt. (*People v. Welch* (1999) 20 Cal.4th 701, 767.) In addition, "[b]oth proposed instructions were argumentative in directing that '[a] juror may find that a mitigating circumstance exists if there is any evidence to support it no matter how weak the evidence is,' without a similar direction as to aggravating evidence. (See *People v. Carter*[, *supra*,] 30 Cal.4th [at p.] 1225.)" (*People v. Brasure* (2008) 42 Cal.4th 1037, 1069-1070.)

Special Instruction No. 8 dealt specifically with victim impact evidence. It directed that such evidence could not be considered "to divert [jurors'] attention from [their] proper role of deciding whether defendant should live or die," and a death sentence could not be imposed based on an irrational or emotional response to such evidence. The instruction further stated: "On the other hand, evidence and argument on emotional though[] relevant subjects may provide legitimate reasons to sway the jury to show mercy." This proposed instruction was clearly argumentative because it invited the jury to draw inferences favorable only to one side. (*People v. Carter*, *supra*, 30 Cal.4th at p. 1225.) It told jurors they could not

72

base a decision to impose the death penalty on an emotional response to victim impact evidence but also told jurors they could rely on emotional evidence and argument "to show mercy" toward defendant. In contrast, the jury was properly instructed by CALJIC No. 8.84.1 that *both sides* had a right to expect jurors to "consider all the evidence, follow the law, exercise [their] discretion conscientiously, and reach a just verdict." The court did not err in rejecting defendant's duplicative and argumentative proposed instruction.

### E. *Response to Jury Question about Unanimity*

On the second day of penalty phase deliberations, the jury sent a note to the court asking, in relevant part: "What happens if the jury is unable to reach a unanimous decision?" The jury also asked whether the court would decide on a sentence and whether a sentence of life imprisonment without parole would be given automatically. Defense counsel requested that the jury be given a verbatim reading of section 190.4, subdivision (b), which would instruct them that in the event they could not reach a unanimous verdict, the court would dismiss the jury and impanel a new jury to try the issue of penalty. In the alternative, he requested an instruction telling the jury it had received all the law and the evidence and was not to speculate as to the consequences of their failure to agree. As a third alternative, defense counsel asked the court to give CALJIC No. 17.40.[18] The prosecutor objected that defendant's proposed instructions were inappropriate because the jury had not indicated it was deadlocked. It had merely asked what would happen if it did deadlock.

---

[18] CALJIC No. 17.40, which was given in the guilt phase of defendant's trial, states: "The People and the defendant are entitled to the individual opinion of each juror. [¶] Each of you must consider the evidence for the purpose of reaching a verdict if you can do so. Each of you must decide the case for yourself, but should do so only after discussing the evidence and instructions with the other jurors. [¶] Do not hesitate to change an opinion if you are convinced it is wrong. However, do not decide any question in a particular way because a majority of the jurors, or any of them, favor such a decision. [¶] Do not decide any issue in this case by chance, such as the drawing of lots or by any other chance determination."

The trial court observed that almost exactly the same question was presented in *People v. Thomas* (1992) 2 Cal.4th 489, 539, in which the jury asked, " 'What would be the action taken by the court in the event that the jury is unable to reach a unanimous decision?' " We approved of the court's response, which advised the jury not to consider or concern itself with this matter and told jurors to " 'make every effort to reach a unanimous decision if at all possible.' " (*Ibid*.) We further held that the *Thomas* court did not err by refusing to instruct the jury that their inability to reach a verdict would result in a retrial of the penalty phase and could not lead to a sentence of less than life without possibility of parole. (*Ibid.*) Expressly relying on our decision in *Thomas*, the trial court here responded to the question from defendant's jury about the consequences of an inability to reach a unanimous verdict by instructing them: "[T]hat subject is not for the jury to consider or to concern itself with. You must make every effort to reach [a] unanimous decision if at all possible." Defendant now claims the court erred in refusing to instruct the jury on the consequences of a deadlock. He also contends the instruction that the jury must reach a unanimous decision if possible was coercive under the circumstance. These claims have no merit.

We have repeatedly held, in cases presenting the same circumstances, that " '[t]he trial court "is not required to 'educate the jury on the legal consequences of a possible deadlock.' " ' [Citations.]" (*People v. Hughes* (2002) 27 Cal.4th 287, 402; see *People v. Rodrigues*, *supra*, 8 Cal.4th at p. 1193.) Informing the jury about the possibility of retrial in the event of a deadlock is risky, because it has "the potential for unduly confusing and misguiding the jury in their proper role and function in the penalty determination process. Penalty phase juries are presently instructed that their proper task is to decide between a sentence of death and life without the possibility of parole. Any further instruction along the lines suggested herein could well serve to lessen or diminish that obligation in the jurors' eyes. [Citations.]" (*People v. Belmontes* (1988) 45 Cal.3d 744, 814, disapproved on another ground in *People v. Doolin*, *supra*, 45 Cal.4th at p. 421,

74

fn. 22.)  As we have emphasized, at the penalty stage, "[t]he proper focus of the jury's deliberations is which penalty to choose, and not whether to make the choice in the first place."  (*People v. Waidla*, *supra*, 22 Cal.4th at p. 746.)  The potential for mischief is especially acute when, as here, the jury's question comes early in their deliberations and there is no indication of an actual, as opposed to hypothetical, failure to agree.  "Especially in a case like this — in which it was not clear that there *actually was* any deadlock — an instruction informing the jury of the consequence of a deadlock 'would have diminished the jurors' sense of duty to deliberate, and to be open to the ideas of fellow jurors.  *The effect of a hung jury is irrelevant to the jury's deliberation of any issue before it*.'  (*People v. Rich* (1988) 45 Cal.3d 1036, 1115, italics added.)"  (*Hughes*, at p. 402.)

For a contrary result, defendant relies on a statement taken out of context from our opinion in *People v. Wader* (1993) 5 Cal.4th 610.  In *Wader*, absent any note from the jury inquiring about the consequences of a failure to achieve unanimity, the defendant requested that the court give an instruction stating that the jury was not required to reach a verdict and that " '[t]he possibility of a hung jury is an inevitable by-product of the requirement that a verdict must be unanimous.' "  (*Id*. at p. 664.)  We found the trial court properly denied this request.  In reaching this conclusion, we said, "there is no duty to instruct a jury regarding its possible failure to reach a verdict in the absence of a request by the jury for an explanation."  (*Ibid*.)  Defendant seizes on this statement as support for his argument that when there *is* a request by the jury for an explanation about the consequences of a failure to reach a unanimous verdict, the court *has* a duty to instruct on the point.  However, when viewed in context, the statement in *Wader* refutes, rather than supports, defendant's interpretation.  Referring to our established case law *criticizing* instructions that explain the possibility of retrial, we stated:  "We have previously rejected the proposition that when a jury asks the trial court what will happen if it fails to reach a penalty verdict, the court must explain to the jury the consequences of its failure to agree.  (*People v. Morris*

75

(1991) 53 Cal.3d 152, 227.) It follows that there is no duty to instruct a jury regarding its possible failure to reach a verdict in the absence of a request by the jury for an explanation." (*Wader*, at p. 664.) In other words, there is no duty to instruct when the jury does not ask for an explanation because there is no duty to instruct even when the jury *does* ask. (See also *People v. Waidla*, *supra*, 22 Cal.4th at pp. 746-747 [although a trial court "may" instruct a deliberating jury on the consequences of its inability to reach a unanimous verdict, nothing in the federal Constitution requires it to do so].)

Finally, it was not coercive to instruct the jury, in response to the note, "You must make every effort to reach [a] unanimous decision if at all possible." Defendant likens this statement to various "dynamite" instructions we have disapproved in the past. (See, e.g., *People v. Gainer* (1977) 19 Cal.3d 835, 852.) The comparison is inapt. The trial court here simply reminded the jury of its duty to deliberate and try to reach a unanimous verdict *if possible*. The instruction did not introduce extraneous factors into deliberations by admonishing minority jurors to reconsider their positions, or by pressuring jurors into reaching a decision quickly. (See *Gainer*, at pp. 847-852.)[19]

### F. *Refusal of Juror Misconduct Hearing*

Defendant challenges the trial court's failure to conduct an evidentiary hearing to investigate alleged jury misconduct. He claims these errors violated section 1120 and deprived him of various constitutional rights. Because there was no evidence that any misconduct occurred, we conclude the decision not to hold an evidentiary hearing was well within the court's discretion.

Defendant's complaints concern Juror William M., a first-year law student who served as the foreperson during the guilt and penalty phases of trial. William

---

[19]    Defendant also contends the instruction may have had a coercive effect in combination with alleged misconduct of the jury foreperson. Because we have rejected defendant's claim of jury misconduct (see *post*, at pp. 76-79), the premise of this claim fails. Nothing in the record supports defendant's speculation that the jury may have been coerced into returning a death verdict.

M. had completed one semester of law school when trial started, and he had not yet taken any criminal law courses. During voir dire, William M. said he understood he could not consult law books or research death penalty law. He also confirmed that he could follow the court's instructions on the law even if they conflicted with his legal training.

On the morning of the third day of penalty phase deliberations, defense counsel went on record to express concern that William M. was serving as foreperson for the penalty phase, when he had previously filled this role in guilt phase deliberations. Counsel was displeased that the jury had chosen a law student as foreperson, especially because counsel had seen William M. during a recent break "talking to various jurors, huddling with them, and he has had law books with him, studying law books during deliberations . . . ." Counsel believed the jury's note of the previous day, asking about the consequences of a lack of unanimity, was "curiously framed . . . as if [the foreperson] had read the 1977 [death penalty] law" and was "expressing independent knowledge of the law" to other jurors. He expressed fear that some holdout jurors might be intimidated by William M. and not understand that they could communicate directly with the court about a deadlock. The court responded that there was "absolutely no evidence" jurors felt coerced or intimidated by the foreperson; however, the court was concerned that defense counsel had seen the juror studying a law book. Defense counsel clarified that he did not know if it was a criminal law book, and he had no independent knowledge that the juror was researching criminal issues or communicating any legal knowledge to his fellow jurors.

The court questioned William M. about defense counsel's accusations. The juror said that he was still attending classes, but he had not studied or researched anything relating to criminal law or procedure. The book he was reading during breaks was a property law textbook. Nor had William M. talked with other jurors about criminal law. He sent out the previous day's jury note "because the group as

77

a whole wanted these questions answered." Based on these responses, the court decided not to inquire further, and the jury resumed its deliberations.

" 'When a trial court is aware of possible juror misconduct, the court "must 'make whatever inquiry is reasonably necessary' " to resolve the matter.' (*People v. Hayes*, *supra*, 21 Cal.4th at p. 1255, italics omitted.) Although courts should promptly investigate allegations of juror misconduct 'to nip the problem in the bud' (*People v. Keenan* (1988) 46 Cal.3d 478, 532), they have considerable discretion in determining how to conduct the investigation." (*People v. Prieto*, *supra*, 30 Cal.4th at p. 274.) "The decision whether to investigate the possibility of juror bias, incompetence, or misconduct — like the ultimate decision to retain or discharge a juror — rests within the sound discretion of the trial court. [Citation.] The court does not abuse its discretion simply because it fails to investigate any and all new information obtained about a juror during trial." (*People v. Ray* (1996) 13 Cal.4th 313, 343.)

Here, the court considered the speculative concerns posed by counsel. It directly questioned William M. and evaluated his responses. The trial court did not abuse its "considerable discretion" in declining to hold a further evidentiary hearing. Not every incident of potential misconduct requires further investigation. (*People v. Cleveland* (2001) 25 Cal.4th 466, 478.) "[A] hearing is required only where the court possesses information which, if proven to be true, would constitute 'good cause' to doubt a juror's ability to perform his duties and would justify his removal from the case. [Citations.]" (*People v. Ray*, *supra*, 13 Cal.4th at p. 343.) The parties knew William M. was a first-year law student. Neither side challenged him. Consistent with his statements during voir dire, William M. affirmed that he had not studied or researched criminal law during the trial and had not talked with other jurors about these issues. He was never forbidden to read a textbook on property law during court breaks, and defendant did not suggest this study of an unrelated area of law was improper. Nor was any evidence presented supporting defense counsel's speculation that William M. may have done anything

78

improper or intimidated other jurors into believing they could not inform the court of a deadlock.  In short, there was nothing to indicate William M. had violated the court's instructions or committed misconduct of any kind.  Under these circumstances, the trial court properly declined to investigate defendant's unsubstantiated claims further.

### G.	*Limitation of Defense Argument*

Defendant claims the trial court violated his rights to a fair trial, a fair and impartial jury, and a reliable penalty determination by prohibiting defense counsel from comparing his case to more egregious murders prosecuted by the Los Angeles County District Attorney.

To make the point that the decision to seek the death penalty is politically motivated, defense counsel wanted to argue that celebrities are rarely ever charged with special circumstances or given the death penalty.  Specifically, he wanted to compare defendant's case with the prosecutions of O.J. Simpson and the Menendez brothers, who escaped death sentences despite the brutality of their crimes, and other notorious cases.  Although it had misgivings, the trial court initially believed defendant was entitled to make such comparisons because section 190.3, factor (k) permits juries to consider any circumstance that might mitigate the gravity of the offense.  Later in the day, however, the court announced that it was reconsidering this order based on *People v. Mincey*, *supra*, 2 Cal.4th 408, *People v. Wright* (1990) 52 Cal.3d 367, and *People v. Grant* (1988) 45 Cal.3d 829.  The following day, after further discussion, the court ruled that counsel would not be permitted to make any argument comparing the penalties sought or received in other cases.  Based on this court's precedents, the court found that penalties in other cases were necessarily irrelevant to the issues before defendant's jury.  However, it did not preclude defense counsel from arguing that the death penalty is imposed arbitrarily and capriciously, so long as he did not discuss the outcomes of specific cases. Counsel emphasized this point in his closing argument.  He argued that district attorneys' charging practices were arbitrary and

the death penalty was pursued only against "anonymous people, Blacks that kill non[-]Blacks, poor people, people that are not celebrities and[,] most[] importantly[,] people[] who don't have money, who can't afford four, five, six lawyers."[20]

"On numerous occasions, we have upheld a trial court's refusal 'to allow defense counsel to compare the subject crime to other well-known murders' (*People v. Hughes*[, *supra*,] 27 Cal.4th [at p.] 400), or to note the penalty imposed in such cases (*People v. Sakarias* (2000) 22 Cal.4th 596, 640), while allowing argument that there 'were other murderers worse than he' (*People v. Benavides*[, *supra*,] 35 Cal.4th [at p.] 110). '[M]eaningful comparisons with other well-publicized crimes cannot be made solely on the basis of the circumstances of the crime . . . without consideration of the other aggravating and mitigating circumstances.' [Citations.]" (*People v. Farley* (2009) 46 Cal.4th 1053, 1130-1131.) To be relevant, a comparison to the celebrity prosecutions that did not result in imposition of the death penalty would have required a discussion of all the facts and circumstances of those other cases. "We have held that when, as here, a factual comparison with other notorious crimes cannot be made without a time-consuming inclusion of all of the facts in mitigation and aggravation, the trial court can exercise its discretion to control the scope of oral argument by refusing to allow defense counsel to compare the subject crime to other murders. [Citations.]" (*People v. Benavides*, at p. 110.)

In *People v. Benavides*, *supra*, 35 Cal.4th at pp. 109-110, the defendant wanted to compare his case with the well known atrocities committed by Charles Manson, the Boston Strangler, and others whom he would argue were more deserving of the death penalty. We held the court acted within its discretion when it prevented the defense "from presenting specific facts about other notorious

---

**20** The jury may well have understood this last statement as a reference to O.J. Simpson's criminal trial, which took place in Los Angeles shortly before defendant's trial.

murder cases where the death penalty was not imposed, but did not preclude him from arguing that there were other murderers worse than he." (*Id*. at p. 110.) Defendant sought to make essentially the same argument here. As in *Benavides*, the trial court struck an appropriate balance by allowing defendant to argue that the death penalty is arbitrarily and unfairly imposed but prohibiting discussion of specific circumstances in other cases. This ruling was not an abuse of discretion. (See also *People v. Farley*, *supra*, 46 Cal.4th at pp. 1130-1131 [court properly precluded defense counsel from arguing the facts of other cases while still allowing him to argue "defendant's murders were not 'the worst of the worst' "].)

Finally, defendant argues that even if the trial court's ruling was proper, defense counsel should have been permitted to argue the facts of other cases to rebut a reference in the prosecutor's closing argument. In encouraging jurors to impose the death penalty as a just punishment for the murder of Soy SungLao, the prosecutor mentioned a famous incident in which a New York woman was killed near her home while neighbors ignored her cries for help.[21] Because defendant did not object to this argument, his claim is forfeited on appeal. In any event, the prosecutor's fleeting reference to a famous murder did not exceed the boundaries of the trial court's ruling. The prosecutor simply mentioned the incident without discussing any details of the crime or the murderer's prosecution. The court was not obligated to revisit the appropriate limits placed on defense counsel's argument based on this brief reference to a famous crime.

### H. *Intracase Proportionality*

Defendant contends his death sentence is disproportionate to his personal culpability in violation of the Eighth Amendment to the federal Constitution and California law. Although we have rejected the argument that *intercase*

---

[21] The prosecutor argued: "When Kitty Genovese's body was found 20 years ago in a dark alley in New York because people didn't care, it was because people thought that their civic duty comprised only the paying of taxes and the minding of their own business. And when you look at the facts of a case like that, the only thing that it cries out for is death, the only thing it cries out for is justice."

81

proportionality review is constitutionally required, "when a defendant requests intracase proportionality review, as defendant does here, we review the particular facts of the case to determine whether the death sentence is so disproportionate to the defendant's personal culpability as to violate the California Constitution's prohibition against cruel or unusual punishment." (*People v. Wallace* (2008) 44 Cal.4th 1032, 1099.) "To determine whether a sentence is cruel or unusual as applied to a particular defendant, a reviewing court must examine the circumstances of the offense, including its motive, the extent of the defendant's involvement in the crime, the manner in which the crime was committed, and the consequences of the defendant's acts. The court must also consider the personal characteristics of the defendant, including age, prior criminality, and mental capabilities. [Citation.]" (*People v. Hines*, *supra*, 15 Cal.4th at p. 1078.) "If the court concludes that the penalty imposed is 'grossly disproportionate to the defendant's individual culpability' [citation], or, stated another way, that the punishment ' " 'shocks the conscience and offends fundamental notions of human dignity' " ' [citation], the court must invalidate the sentence as unconstitutional." (*Ibid*.)

Defendant's death sentence is not grossly disproportionate to his personal culpability; it does not "shock[] the conscience and offend[] fundamental notions of human dignity." (*In re Lynch* (1972) 8 Cal.3d 410, 424.) Defendant, acting alone, overpowered and brutally stabbed a young woman 30 times in order to steal money from a small shop. This murder occurred during a series of violent armed robberies. Although some of his earlier crimes were less serious, defendant's increasing resort to violence could be inferred from the circumstances of the crimes against Addo, Lao, and Draper, and from the brutal, disfiguring attack on Benita Rodriguez only five days after the murder. The jury could conclude from this evidence that defendant presented a significant, and increasing, danger to society. (See *id*. at p. 425.) Defendant also claims his death sentence was disproportionate to his culpability because he killed only one person and his

counsel was not allowed to compare his crime to notorious examples of multiple murderers. However, "intracase proportionality review examines ' " 'whether [a] *defendant's* death sentence is proportionate to *his* individual culpability, irrespective of the punishment imposed on others.' [Citation.]" ' [Citations.] The guilt or culpability of codefendants or third parties does not affect that analysis. [Citations.]" (*People v. Maury* (2003) 30 Cal.4th 342, 441-442.)

### I. *Constitutionality of Death Penalty Scheme*

Defendant contends the death penalty statutes, sections 190.2 and 190.3, violate the Fifth, Sixth, Eighth, and Fourteenth Amendments to the federal Constitution, and analogous provisions of the California Constitution, in numerous respects. We have rejected each of these challenges in the past and now reaffirm our holdings.

Section 190.2, which sets forth the circumstances in which a death sentence may be imposed, is not impermissibly broad on its face or as interpreted by this court. (*People v. Verdugo* (2010) 50 Cal.4th 263, 304; *People v. Farley*, *supra*, 46 Cal.4th at p. 1133.) Nor does allowing a jury to find aggravation based on the "circumstances of the crime" under section 190.3, factor (a), result in an arbitrary and capricious imposition of the death penalty. (*People v. Williams*, *supra*, 43 Cal.4th at p. 648; *People v. Cook* (2007) 40 Cal.4th 1334, 1366; see also *Tuilaepa v. California*, *supra*, 512 U.S. at p. 976 ["The circumstances of the crime are a traditional subject for consideration by the sentencer, and an instruction to consider the circumstances is neither vague nor otherwise improper under our Eighth Amendment jurisprudence"].)

The restrictive adjectives "extreme" and "substantial" in section 190.3, factors (d) and (g) do not impermissibly limit the jury's consideration of mitigating factors in violation of the federal Constitution. (*People v. Maury*, *supra*, 30 Cal.4th at p. 439; *People v. Williams* (1997) 16 Cal.4th 153, 276.) Further, the trial court had no duty to instruct the jury that certain sentencing factors (§ 190.3,factors (d)-(h) & (j)) can only mitigate, and not aggravate, the

crime.  (*People v. Leonard* (2007) 40 Cal.4th 1370, 1430; *People v. Brown* (2004) 33 Cal.4th 382, 402.)

Neither the United States Constitution nor the California Constitution requires that the jury determine beyond a reasonable doubt "whether aggravating factors are true, whether circumstances in aggravation outweigh those in mitigation, or whether death is the appropriate penalty."  (*People v. Lomax*, *supra*, 49 Cal.4th at p. 594; *People v. Leonard*, *supra*, 40 Cal.4th at p. 1429; *People v. Manriquez* (2005) 37 Cal.4th 547, 589.)  Likewise, nothing in the federal Constitution required the jury to make written findings on the aggravating factors supporting its death verdict.  (*People v. Williams*, *supra*, 43 Cal.4th at p. 648; *People v. Maury*, *supra*, 30 Cal.4th at p. 440; *People v. Frierson* (1979) 25 Cal.3d 142, 178-180.)  The Supreme Court's decisions in *Apprendi*, *supra*, 530 U.S. 466, *Ring*, *supra*, 536 U.S. 584, and *Blakeley*, *supra*, 542 U.S. 296 do not alter these conclusions.  (*People v. Nelson* (2011) 51 Cal.4th 198, 225-226; *People v. Verdugo*, *supra*, 50 Cal.4th at pp. 304-305.)   Furthermore, nothing in the federal Constitution or the high court's decisions in *Apprendi*, *Ring*, or *Blakeley* requires that the jury return a unanimous verdict on aggravating factors.  (*Lomax*, at p. 594; *Manriquez*, at p. 590; *People v. Snow* (2003) 30 Cal.4th 43, 126.)  Nor are penalty phase jury instructions constitutionally deficient for failing to state that mitigating factors need not be found unanimously or by any particular standard of proof.  (*People v. Ervine* (2009) 47 Cal.4th 745, 870; *People v. Rogers*, *supra*, 39 Cal.4th at p. 897.)  Because the decision whether to sentence a defendant to death is essentially a normative one, we have held the prosecution bears no burden of persuasion in the penalty phase.  (*People v. Lenart* (2004) 32 Cal.4th 1107, 1136-1137; *People v. Hayes* (1990) 52 Cal.3d 577, 643.)  We decline defendant's invitation to revisit this conclusion.  Nor does the federal or state Constitution require an instruction explaining that there is no burden of proof in the penalty phase.  (*People v. Farley*, *supra*, 46 Cal.4th at p. 1133.)

"The failure of California's death penalty law to require intercase proportionality does not violate the federal Constitution.  (*Pulley v. Harris* (1984) 465 U.S. 37, 50-51; *People v. Cox* (2003) 30 Cal.4th 916, 970.)"  (*People v. Verdugo*, *supra*, 50 Cal.4th at p. 305.)  We decline defendant's invitation to reexamine our settled law on this point based on " 'evolving standards of decency.' "  (*Roper v. Simmons* (2005) 543 U.S. 551, 561 [125 S.Ct. 1183, 1190].)  "Nor does the circumstance that intercase proportionality review is conducted in noncapital cases cause the death penalty statute to violate defendant's right to equal protection and due process."  (*People v. Farley*, *supra*, 46 Cal.4th at p. 1134.)  Defendant also claims that, even if the absence of certain protections does not render California's death penalty procedures unconstitutional, the availability of some of these protections to noncapital defendants denies equal protection to those facing the death penalty.  We have rejected this argument in the past (e.g., *People v. Cook*, *supra*, 40 Cal.4th at p. 1367; *People v. Blair* (2005) 36 Cal.4th 686, 754) and continue to do so.  (*People v. Lomax*, *supra*, 49 Cal.4th at p. 594.)  "[C]apital and noncapital defendants are not similarly situated and therefore may be treated differently without violating constitutional guarantees of equal protection of the laws or due process of law [citations] . . . ."  (*People v. Manriquez*, *supra*, 37 Cal.4th at p. 590.)

Finally, this court has repeatedly held that California's death penalty scheme does not violate the Eighth Amendment to the United States Constitution or international law, including part III, article 7 of the International Covenant on Civil and Political Rights.  (*People v. Lewis*, *supra*, 43 Cal.4th at pp. 538-539; *People v. Butler*, *supra*, 46 Cal.4th at p. 885.)

**J.**     *Political Considerations*

Defendant asserts that political and economic pressures have biased California courts in favor of imposing the death penalty.  He claims this bias has led to arbitrary and capricious sentencing in violation of his rights under the Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution and

article I, sections 1, 7, 9, 15, 16, 17, and 24 of the California Constitution.  We have previously considered and rejected this claim (*People v. Kipp* (2001) 26 Cal.4th 1100, 1139-1141), and defendant does not persuade us to revisit our decision.  (See *People v. Hughes*, *supra*, 27 Cal.4th at p. 406.)

### K.  *International Law*

Defendant claims that errors infringing his state and federal constitutional rights also amount to violations of international law.  For this reason, he argues the death sentence must be set aside.  We have repeatedly rejected this argument. (*People v. Ward*, *supra*, 36 Cal.4th at p. 222; *People v. Brown*, *supra*, 33 Cal.4th at pp. 403-404.)   "International law does not prohibit a sentence of death rendered in accordance with state and federal constitutional and statutory requirements. [Citations.]"  (*People v. Hillhouse*, *supra*, 27 Cal.4th at p. 511.)  In this case, "we need not consider whether a violation of state or federal constitutional law would also violate international law, 'because defendant has failed to establish the premise that his trial involved violations of state and federal constitutional law . . . .'  ([*People v. Jenkins* (2000)] 22 Cal.4th [900,] 1055.)"  (*Hillhouse*, at p. 511.)

### L.  *Cumulative Error*

Defendant argues the cumulative effect of guilt and penalty phase errors requires reversal of his death sentence.  Because defendant has not established that any prejudicial error occurred at either phase of his trial, this claim fails.  (See *People v. Butler*, *supra*, 46 Cal.4th 847, 885.)

## DISPOSITION

The judgment is affirmed.

**CORRIGAN, J.**

**WE CONCUR:**

**CANTIL-SAKAUYE, C. J.**
**KENNARD, J.**
**BAXTER, J.**
**WERDEGAR, J.**
**CHIN, J.**
**BIGELOW, J.** *

---

\*    Presiding Justice, Court of Appeal, Second Appellate District, Division Eight, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

*See next page for addresses and telephone numbers for counsel who argued in Supreme Court.*

**Name of Opinion** People v. Virgil

_____

**Unpublished Opinion**
**Original Appeal** XXX
**Original Proceeding**
**Review Granted**
**Rehearing Granted**


_____

**Opinion No.** S047867
**Date Filed:** June 30, 2011

_____

**Court:** Superior
**County:** Los Angeles
**Judge:** Steven C. Susukawa


_____

**Counsel:**

Manuel J. Baglanis, under appointment by the Supreme Court, and Meredith L. Fahn for Defendant and Appellant.

Bill Lockyer and Kamala D. Harris, Attorneys General, Robert R. Anderson and Dane R. Gillette, Chief Assistant Attorneys General, Pamela C. Hamanaka, Assistant Attorney General, Sharlene A. Honnaka, Erika D. Jackson and Michael C. Keller, Deputy Attorneys General, for Plaintiff and Respondent.

**Counsel who argued in Supreme Court (not intended for publication with opinion):**

Manuel J. Baglanis
P.O. Box 700035
San Jose, CA  95170-0035
(408) 446-3987

Michael C. Keller
Deputy Attorney General
300 South Spring Street, Suite 1702
Los Angeles, CA  90013
(213) 897-6973